## Exhibit C

**June 22, 2020 Hearing Transcript**

1

```
 1                 UNITED STATES BANKRUPTCY COURT
                 WESTERN DISTRICT OF NORTH CAROLINA
 2                       CHARLOTTE DIVISION

 3   IN RE:                    :    Case No. 20-30608-JCW
                                    (Jointly Administered)
 4   ALDRICH PUMP LLC, ET AL.,  :
                                    Chapter 11
 5        Debtors,             :
                                    Charlotte, North Carolina
 6                             :    Monday, June 22, 2020
                                    2:14 p.m.
 7                             :

 :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :
 8
     ALDRICH PUMP LLC and MURRAY   :    AP 20-03041-JCW
 9   BOILER LLC,
                               :
10        Plaintiffs,
                               :
11            v.
                               :
12   THOSE PARTIES TO ACTIONS
     LISTED ON APPENDIX A TO     :
13   COMPLAINT and JOHN AND JANE
     DOES 1-1000,                :
14
          Defendants.            :
15

 :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :  :
16
          TRANSCRIPT OF EMERGENCY HEARING ON FIRST DAY PLEADINGS
17               BEFORE THE HONORABLE J. CRAIG WHITLEY,
                    UNITED STATES BANKRUPTCY JUDGE
18

19
     Audio Operator:              COURT PERSONNEL
20

21   Transcript prepared by:      JANICE RUSSELL TRANSCRIPTS
                                  1418 Red Fox Circle
22                                Severance, CO  80550
                                  (757) 422-9089
23                                trussell31@tdsmail.com

24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

```
 1   APPEARANCES (via video and telephone conference):

 2
     For the Debtors:              Rayburn Cooper & Durham, P.A.
 3                                 BY:  JOHN R. MILLER, JR., ESQ.
                                   227 West Trade St., Suite 1200
 4                                 Charlotte, NC  28202

 5                                 Jones Day
                                   BY:  DAVID S. TORBERG, ESQ.
 6                                 51 Louisiana Avenue, N.W.
                                   Washington, D.C. 20001
 7
                                   Jones Day
 8                                 BY:  GENNA GHAUL, ESQ.
                                        JAMES M. JONES, ESQ.
 9                                 250 Vesey Street
                                   New York, NY  10281
10
                                   Jones Day
11                                 BY:  BRAD B. ERENS, ESQ.
                                        MARK A. CODY, ESQ.
12                                      CAITLIN K. CAHOW, ESQ.
                                   77 West Wacker, Suite 3500
13                                 Chicago, IL  60601

14                                 Evert Weathersby Houff
                                   BY:  C. MICHAEL EVERT, JR., ESQ.
15                                 3455 Peachtree Road, NE, #1550
                                   Atlanta, GA 30326
16
     For Certain Asbestos          Caplin & Drysdale
17   Claimants:                    BY:  KEVIN MACLAY, ESQ.
                                        TODD PHILLIPS, ESQ.
18                                 One Thomas Circle, NW, Suite 1100
                                   Washington, DC  20005
19
                                   Robinson & Cole LLP
20                                 BY:  NATALIE D. RAMSEY, ESQ.
                                        DAVIS LEE WRIGHT, ESQ.
21                                      JAMIE L. EDMONSON, ESQ.
                                   1201 N. Market Street, Suite 1406
22                                 Wilmington, DE  19801

23                                 Robinson & Cole LLP
                                   BY:  LAURIE A. KREPTO, ESQ.
24                                 1650 Market Street, Suite 3600
                                   Philadelphia, PA  19103
25
```

```
 1  APPEARANCES (via video and telephone conference continued):

 2  For Certain Asbestos          Maune Raichle
    Claimants:                    BY:  MARCUS RAICHLE, JR., ESQ.
 3                                     CHRIS McKEAN, ESQ.
                                  1015 Locust Street, Suite 1200
 4                                St. Louis, MO  63101

 5                                Essex Richards, P.A.
                                  BY:  HEATHER W. CULP, ESQ.
 6                                1701 South Boulevard
                                  Charlotte, NC  28203
 7
                                  Winston & Strawn LLP
 8                                BY:  DAVID NEIER, ESQ.
                                  200 Park Avenue
 9                                New York, NY  10166-4193

10  For _____:                 Windels Marx
                                  BY:  ANDREW CRAIG, ESQ.
11                                One Giralda Farms
                                  Madison, NJ  07940
12
    For Trane Technologies        McCarter & English, LLP
13  Company LLC and Trane U.S.    BY:  GREGORY J. MASCITTI, ESQ.
    Inc.:                         825 Eighth Avenue, 31st Floor
14                                New York, NY  10019

15                                Burt & Cordes, PLLC
                                  BY:  STACY C. CORDES, ESQ.
16                                122 Cherokee Road, Suite 1
                                  Charlotte, NC  28207
17
    For Richard and Calvena       JD Thompson Law
18  Sisk:                         BY:  LINDA W. SIMPSON, ESQ.
                                  P. O. Box 33127
19                                Charlotte, NC  28233

20                                Kazan McClain
                                  BY:  STEVEN KAZAN, ESQ.
21                                55 Harrison St. Suite 400
                                  Oakland, CA  94607
22
    For Bankruptcy Administrator: SHELLEY ABEL
23                                402 W. Trade Street, Suite 200
                                  Charlotte, NC  28202-1669
24

25
```

<div align="center">

INDEX

</div>

|   |   | Cross |
|---|---|---|
| <u>WITNESSES FOR THE CLAIMANTS</u>: | | |
| Ray Pittard | 115 | |
| Allan Tananbaum | 122 | |

| <u>EXHIBITS</u>: | <u>Marked</u> | <u>Received</u> |
|---|---|---|
| Declarations of Ray Pittard and Allan Tananbaum | | 73 |

1                         P R O C E E D I N G S

2         (Call to Order of the Court)

3              THE COURT:  Have a seat.

4              We're -- for those who haven't met me, I'm Judge

5    Whitley.  We're here in Aldrich Pump and Murray Boiler for

6    first day hearings.  We're having to do this by a combination

7    of videoconferencing and teleconferencing and I understand

8    y'all've already had some technical issues.  In addition to

9    whatever the computer might do to everyone, let me also say

10   that if you hear pumping in the background, it is neither your

11   heart rate nor the computer, but instead, construction going on

12   immediately behind us on the annex.  The building staff decided

13   today would be a good day to start running a jackhammer and

14   we'll have some extraneous noise.  So we'll do the best we can.

15             Let -- before we get going, let me see who we have

16   appearing.  If you're just listening in and don't need to

17   announce, I don't need to hear from you.  But otherwise, what

18   I'd like to do is start with those who are appearing by video

19   and ask those parties to announce not only their own

20   appearances, but anyone else that is representing the same

21   client.  And then I'll go to those appearing telephonically and

22   needing to announce and from there, if we miss anyone, then

23   I'll call for others.

24             Ground rules, generally speaking, if you are not

25   speaking -- I'm a little reluctant to say this considering the

1  problems that you were having a moment ago -- but if you are

2  not speaking, generally, I want you to mute your, your

3  microphones.  Please don't put us on hold.  Don't interrupt

4  other speakers.  I'll give everyone a full chance to, to speak

5  today.  And otherwise, if you get knocked off, try to get back

6  on the line and if not, make a, a note of the time so that we

7  know when you were missing and we'll try to do the best we can.

8         But the bottom line is if some of you have multiple

9  attorneys in the case, we may have to go to your secondary

10 attorney if we can't get you back on the line.

11        So with that, we'll give it a go.

12        Starting out, I understand, Mr. Miller, Jack Miller,

13 you're here on behalf of, of the debtors in possession?

14        MR. MILLER:  Yes, your Honor.  Thank you.

15        THE COURT:  All right.

16        Also, Mr. Rayburn, is he appearing?

17    (No response)

18        THE COURT:  Mr. Gordon?  Greg Gordon's on the line?

19    (No response)

20        THE COURT:  No.

21        Brad Erens?

22        MR. ERENS:  Yes, your Honor.  Brad Erens, E-R-E-N-S,

23 of Jones Day on behalf of the debtors.  Thank you.

24        THE COURT:  Okay.  Thank you.

25        Let's see.  We had Glenn Thompson?  Mr. Thompson on

1    the line?

2        (No response)

3            THE COURT:  Stacy Cordes?

4            MS. CORDES:  Good afternoon, your Honor.  I'm --

5    I'm --

6            THE COURT:  I see you.

7            MS. CORDES:  Yes.

8            THE COURT:  Okay.  Got anyone else that you need to

9    announce for?

10           MS. CORDES:  Stacy Cordes on behalf of Trane

11   Technologies Company LLC and Trane U.S. Inc. and on the Zoom

12   call with me is Greg Mascitti.  I'm local counsel and he can

13   announce for himself.

14           MR. MASCITTI:  Greg Mascitti, McCarter & English, on

15   behalf of Trane Technologies Company LLC and Trane U.S. Inc.

16           THE COURT:  Okay.  Thank you.

17           MR. MASCITTI:  Good afternoon, your Honor.

18           THE COURT:  All right.

19           I believe that -- anyone else on the videoconference

20   that I don't have, already?

21       (No response)

22           THE COURT:  Okay.

23           MS. SIMPSON:  Linda Simpson.

24           THE COURT:  Okay.

25           MS. SIMPSON:  I'll be on behalf of the Sisks --

1                    THE COURT:  All right.

2                    MS. SIMPSON:  -- personal injury claimants --

3                    THE COURT:  Uh-huh (indicating an affirmative

4       response).

5                    MS. SIMPSON:  -- and Steven Kazan is also on for,

6       listening.

7                    THE COURT:  Okay.

8                    Anyone else on the video?

9                    All right.  Appearing --

10                   MS. ABEL:  Shelley Abel, Bankruptcy Administrator.

11                   THE COURT:  Very good, thank you.

12                   MR. CODY:  Your Honor, Mark Cody here on behalf of the

13      debtors as well from Jones Day.

14                   MS. CAHOW:  And good afternoon, your Honor.  Caitlin

15      Cahow, Jones Day, on behalf of the debtors.

16                   THE COURT:  Anyone else on the video?

17          (No response)

18                   THE COURT:  All right.  Telephonically, I understood

19      there were a number of other Jones Day attorneys on, on behalf

20      of the debtor.

21                   Mr. Torberg, are you with us?  Torberg?

22          (No response)

23                   THE COURT:  Ms. Cahow has already said something.

24                   Genna Ghaul?  Ghaul?  Ghaul?

25                   MS. GHAUL:  Yes, your Honor.  Genna Ghaul of Jones

1   Day.

2           THE COURT:  All right, very good.

3           And let's see.  Mr. Evert, Michael Evert?

4           MR. EVERT:  Yes, your Honor.

5           THE COURT:  All right.

6           And Matthew Tomsic?

7       (No response)

8           THE COURT:  All right.

9           And then other telephonics.  I'm showing Steven Kazan

10          Mr. Kazan, who are you representing?  You can unmute

11   if --

12          MR. KAZAN:  Your Honor, I'm with Linda Simpson on

13   behalf of our clients, the Sisks.

14          THE COURT:  Thank you.

15          Mr. Parrish, Felton Parrish?

16      (No response)

17          THE COURT:  Mr. Parrish is not on.

18          Andrew Craig?  Mr. Craig?

19          MR. CRAIG:  I'm on the video, your Honor.

20          THE COURT:  Okay.  Sorry.  I got these so quickly --

21          MR. CRAIG:  Sorry about that.

22          THE COURT:  -- I wasn't paying attention to who was

23   announcing where, so.

24          Marcus Raichle?

25      (No response)

```
 1              THE COURT:  No.

 2              MR. RAICHLE:  I apologize.  I had a little trouble

 3    turning off my mute.

 4              I'm being repre -- my clients are represented by

 5    Natalie Ramsey and Kevin Maclay of Robinson & Cole and Caplin &

 6    Drysdale.

 7              THE COURT:  Okay, very good.

 8              Chris McKean?

 9              MR. RAICHLE:  He's with me.

10              THE COURT:  Okay.

11              Heather Culp?

12              MR. RAICHLE:  Here as well.

13              THE COURT:  Okay.

14              Mr. David McGonigle, K&L Gates?  Mr. McGonigle?

15         (No response)

16              THE COURT:  Ashley Surinak?

17         (No response)

18              THE COURT:  No.

19              Jamie Edmonson?

20              MS. EDMONSON:  Yes, your Honor.  I represent

21    Mr. Raichle's clients with Ms. Ramsey and Mr. Maclay.

22              THE COURT:  All right.  We got a lot of feedback.

23    Could you try that one more time?

24              MS. EDMONSON:  Yes, I'll try, your Honor.  Jamie

25    Edmonson, Robinson & Cole.  I represent Mr. Raichle's clients
```

1   with Ms. Ramsey and Mr. Maclay.

2          THE COURT:  Laurie Krepco, Krepto?

3          MS. KREPTO:  Your Honor, this is Laurie Krepto and I'm

4   with Jamie Edmonson and Natalie Ramsey with the Robinson & Cole

5   firm.

6          THE COURT:  Very good.

7          Rob Jordan?

8          MR. JORDAN:  Yes, yes, your Honor.  I'm here.

9          THE COURT:  Okay.  And, Mr. Jordan, are you with the

10  same group?

11         MR. JORDAN:  I am with KCC, the claims agent.

12         THE COURT:  Very good, thank you.

13         Ms. Ramsey, we've already gotten you.

14         Mr. Maclay?

15         MR. MACLAY:  Yes, your Honor.  Obviously, I'm here

16  from Caplin & Drysdale, along with, with Natalie and, and Dave

17  Neier from Winston.  With me on the phone, but he's muted so he

18  can't speak up is Todd Phillips.

19         THE COURT:  Okay, very good.

20         David Neier, Neier?

21         MR. NEIER:  Good afternoon, your Honor.  David Neier

22  on behalf of the same clients as Ms. Ramsey and Mr. Maclay.

23         THE COURT:  Okay, very good.

24         Ms. Abel, we already got.

25         James Jones?

1          MR. JONES:  Here, your Honor.  I'm with Jones Day as

2    well.

3          THE COURT:  Okay, very good.

4          And Michael Brockland?

5       (No response)

6          THE COURT:  Okay.

7          Are there others on the line that need to announce

8    appearances?  If you're just listening to the, to the hearing

9    and don't anticipate speaking or representing anyone, I don't

10   need an announcement.

11         But are there any others on the telephone line?

12         MR. MILLER:  Your Honor, this is Jack Miller.  I know

13   Mr. Torberg, you called his name and he didn't respond, but I

14   do know he's on.

15         THE COURT:  Okay, very good.

16         MR. TORBERG:  Yes, I am on, your Honor.

17         THE COURT:  Excellent.

18         MR. TORBERG:  Can you hear me now?

19         THE COURT:  Yes, sir.

20         MR. TORBERG:  Okay, thank you.

21         THE COURT:  Anyone else?

22      (No response)

23         THE COURT:  Okay, very good.

24         First day motions.  I suppose I ought to turn -- who's

25   going to be speaking on behalf of the debtor, debtors, at this

1   moment in the case?

2          MR. MILLER:  Your Honor, this is Jack Miller.  I, I

3   was going to start it off and then I'll hand things off to

4   Mr. Erens, if that's okay with the Court.

5          THE COURT:  Please.

6          MR. MILLER:  All right.  Afternoon, your Honor.  Jack

7   Miller, Rayburn Cooper & Durham, on behalf of the debtors,

8   Aldrich Pump LLC and Murray Boiler LLC.

9          THE COURT:  Uh-huh (indicating an affirmative

10  response).

11         MR. MILLER:  First off, thank you very, very much for

12  the Court's accommodation this afternoon.  I think the Court

13  knows we always do appreciate the Court's flexibility in

14  scheduling us in here.

15         THE COURT:  Uh-huh (indicating an affirmative

16  response).

17         MR. MILLER:  Your Honor, as I said, the, the folks

18  with Jones Day are going to be handling the first days.  I

19  think Mr. Erens is going to, is going to kick it off with a

20  little bit of background and then turn it over to Mr. Cody and

21  Ms. Cahow to, to handle the administrative first day pleadings

22  and then it'll probably go back to Mr. Erens to deal with the

23  adversary proceeding.

24         And so with that, your Honor, it's my pleasure to

25  introduce those three to the Court and look forward to, to

1    working with them.  Thank you, your Honor.

2            THE COURT:  All right.

3            Mr. Erens?

4            MR. ERENS:  Thank you, your Honor.  Yes, Brad Erens,

5    again, E-R-E-N-S, of Jones Day on behalf of the debtors.

6            As Mr. Miller indicated, we did want to give a little

7    bit of background in this case before we got into the first day

8    motions, in particular, the corporate history, some of the

9    product history, the asbestos litigation that's led us to come

10   to this Court, and then our ultimate plans for this chapter 11

11   proceeding.

12           If you don't mind, your Honor, I just wanted to pin

13   the video so I can see, your Honor as well.  Thank you.  Okay.

14           As Mr. Miller indicated, there are two debtors,

15   Aldrich Pump and Murray Boiler.  The reason there are two

16   debtors in this case is, historically, for this corporate

17   family there were two legal entities that, that were the

18   subject of asbestos claims in the tort system.  Those two

19   entities now today are Aldrich Pump and Murray Boiler.  Both

20   companies are indirect wholly-owned subsidiaries of Trane

21   Technologies plc, that's a publicly traded company.  The

22   headquarters of Trane Technologies as well as the debtors,

23   Aldrich and Murray, are in Davidson, North Carolina.

24           So again, it's not just Trane.  The debtors'

25   headquarters are up the road in Davidson, North Carolina.  So

1   we're happy to be, your Honor, in the neighborhood in a local

2   court and the companies' executives are, are nearby the Court.

3   The debtors have filed these chapter 11 cases, your Honor, to

4   address unrelenting burden of asbestos claims that have been

5   pursued against them for many, many years at this point.

6        Let start off with some products history.  The

7   debtors, I think it's important to note, never used asbestos to

8   manufacture a product.  Rather, historically, going back a

9   couple of decades now, more than a couple decades, the debtors

10  made equipment that, in some instances, incorporated asbestos-

11  containing components manufactured and designed by third

12  parties.  I should mention, your Honor, most, if not all, of

13  what I'm going to say is in our Information Brief that we filed

14  on the first day, but I wanted to do this to highlight some

15  items for purposes of this court hearing.

16       So let's start with debtor, Aldrich.  Aldrich's

17  asbestos litigation history largely surrounds its manufacture

18  of pumps and compressors that incorporated metal piping through

19  which liquids or gases flowed.  And I think it's important to

20  understand the product, your Honor.  I won't spend a lot of

21  time on this, but where the pipes in the equipment connected to

22  each other or to metal surfaces leaks could occur and as a

23  result a ring-shaped sealing product known as a gasket was

24  inserted into the connection between the pipes or between the

25  pipes and the metal surfaces to avoid such leaks and to protect

1   against sealing failures that, your Honor, could be quite

2   serious.  If you have high temperature liquids or high volume

3   liquids or gases, a leak could cause serious illness -- excuse

4   me -- serious injury, death, or catastrophic losses. The

5   gaskets, most importantly, spent their entire lives inserted

6   between the two pieces of metal, either the pipes or the pipe

7   and the metal surfaces, except when the equipment needed

8   repair.

9         So that's the product, mostly, that Aldrich has been

10  involved with.  Until about, roughly, 30 years ago certain

11  gaskets, not all gaskets, but certain gaskets available in the

12  marketplace contained asbestos.  In nearly all instances, the

13  type of asbestos fiber used in the gaskets purchased by

14  Aldrich, again from third parties, was chrysotile, a form of

15  asbestos that I think is widely recognized as either incapable

16  of causing, or certainly far less likely to cause disease than

17  fibers such as amphiboles.  And any asbestos fibers contained

18  in the gaskets were fully encapsulated.  So this was not a

19  friable product.

20        So the gaskets were inserted between the pipes, the

21  gaskets themselves were chrysotile, and the gaskets were

22  encapsulated in terms of the asbestos contained.  On rare

23  occasions when the gaskets might be disturbed to conduct

24  equipment repairs, any potential exposure to the asbestos

25  fibers was well below government's permissible exposure levels

1    for asbestos.  That's the basic history that we have with

2    respect to Aldrich.

3            With respect to Murray, there's a significant amount

4    of overlap.  So Murray's asbestos claims primarily have arisen

5    from the sale of heating and cooling equipment that also

6    incorporated gaskets or other sealing products for the exact

7    same reasons that Aldrich did, to prevent leaks.  Various parts

8    of Murray's operations that incorporated such sealing products

9    were either shut down or sold or, largely, eliminated the use

10   of asbestos-containing gaskets sometime during the 1970s or the

11   1980s.  There is one other product that's relevant from Murray

12   before, roughly, the mid-1950s.  So, you know, almost 70 years

13   ago now, your Honor.  Murray also designed and sold some

14   boilers that may have been insulated with external, external

15   asbestos-containing insulation.  Like the gaskets, Murray did

16   not manufacture that insulation.  It was manufactured by third

17   parties.  And again, this now goes back almost 70 years.  So

18   that's the basic product history.

19           I want to talk a little bit about mesothelioma claims

20   in the tort system and what I think your Honor's probably

21   familiar with, which is the bankruptcy wave that occurred now

22   about 20 years ago, around 2000.  Asbestos litigation today in

23   the tort system is dominated by claims for individuals

24   asserting mesothelioma.  Exposure to certain types of friable

25   amphibole asbestos, such as existed in certain insulation and

1   other asbestos-containing products manufactured mostly before

2   the mid-1970s, can cause mesothelioma.  However, whether

3   mesothelioma can be caused by exposure to chrysotile asbestos

4   at all and what, how much intensity or how much exposure really

5   is, continues to be a source of scientific debate, but there is

6   consensus, we believe, your Honor, that chrysotile is far less

7   toxic than the amphiboles.  Further, in many individuals,

8   mesothelioma can occur without exposure to occupational

9   products.

10          So, No. 1, mesothelioma can occur from exposure to

11   friable amphibole asbestos products, but mesothelioma can also

12   occur from exposure to other products and mesothelioma,

13   frankly, can occur as a result to exposure to any products.  In

14   fact, there's a growing science that mesothelioma occurs in

15   certain people for reasons that are, again, unrelated to

16   occupational exposure and that's a, a greater, larger

17   percentage today of mesothelioma cases.

18          So mesothelioma will continue in the future, your

19   Honor, even though occupational exposures are now decades into

20   the past.

21          In terms of the, the bankruptcy wave, through the 19,

22   late 1990s the primary defendants in the tort system were the

23   miners and sellers of raw asbestos and companies that used

24   asbestos to manufacture other products, again like thermal

25   insulation.  And those primary defendants paid hundreds of

1    millions of dollars annually to resolve mesothelioma claims and

2    other asbestos-related claims.  What we think is very important

3    to understand, your Honor, is during that same period, roughly

4    the 15 years between the mid-80s when Aldrich and Murray

5    started being sued and the beginning of the bankruptcy wave --

6    so roughly, 1985 to 19, up to 2000 -- excuse me -- Aldrich and

7    Murray collectively paid during that period $4 million for 15

8    years to settle mesothelioma claims brought against them.

9    Again, the primary defendants at that time were paying hundreds

10   of millions of dollars.

11          But by the early 2000s, virtually all the primary

12   defendants had filed for bankruptcy and exited the tort system.

13   They would -- these defendants would establish trusts that

14   would have tens of billions of dollars to pay claimants, but

15   almost immediately, we believe, individual claims began to

16   curtail disclosure in their tort cases of their overall

17   asbestos exposures.  Claims against the debtors, along with

18   settlement and trial demands, began to be made as if the

19   primary defendants had never existed, exposure to their

20   products had never occurred, and recovery against the primary

21   defendants, who were now in bankruptcy, was not available

22   through the bankruptcy trusts.

23          Within a few years the number of claims against

24   Aldrich and Murray skyrocketed and soon after the beginning of

25   the bankruptcy wave Aldrich and Murray were receiving, roughly,

1    2500 mesothelioma claims per year.

2          And, your Honor, we throw out that number, it's just a

3    number, but if you think about it, that's a claim every hour of

4    every day of every week during the year.  It is a deluge of

5    mesothelioma claims.  The debtors were now being named in the

6    vast majority of all mesothelioma claims across the country

7    which, in their mind, was sort of inconceivable, given the

8    encapsulated nature of their chrysotile product and gaskets

9    inserted between metal pipes in equipment and the fact that, of

10   course, during the period of time prior to the 1970s there were

11   thousands of asbestos-containing products in the marketplace.

12   It wasn't just gaskets.  It wasn't even just thermal

13   insulation.

14         So that got, that gets us to a point where Aldrich and

15   Murray are now in the tort system postbankruptcy.  What did

16   that mean for them?  Well, one fact of the tort system is that

17   every asbestos suit is an individual case.  It's just the fact

18   of life.  There's no class action system in the tort system for

19   asbestos claims.  So defending a single mesothelioma claim can

20   cost a defendant almost $1 million or sometimes more if taken

21   fully to trial.  If you think about the math, if Aldrich and

22   Murray were getting 2500 claims per year, taking every case to

23   trial, not that they would do that, but just doing the math,

24   2500 times 1 million would be billions of dollars in defense

25   costs, obviously not something they could do.  And again, the

1   claims against them had now undergone undeniable change.

2   Before the primary defendants -- excuse me -- before the

3   primary defendants' exodus from the tort system, ancillary

4   defendants like the debtors could reliably expect that the

5   asbestos claimants would identify exposures to amphibole

6   products of the primary defendants.  Juries would see that the

7   products of the amphibole manufacturers were the primary cause

8   of disease and now that evidence was largely gone from the tort

9   system because the primary defendants had filed for bankruptcy.

10          We think, your Honor, Judge Hodges' seminal case in,

11   or seminal decision in the Garlock case details all this

12   history and detailed a widespread pattern on the part of

13   plaintiffs not to divulge any longer the full exposures that

14   they had had in their occupational periods.  They would not any

15   longer fully divulge the fact that they were exposed to

16   amphibole insulation or other products of companies that were

17   now in bankruptcy.  While claimants would assert exposures only

18   to the products of the defendants now in the tort system, that

19   meant that the debtors -- excuse me -- the companies now in the

20   tort system faced a very difficult situation.  The primary

21   defendants were no longer there to pay the lion's share of the

22   liability and the court and the jury only saw the remaining

23   non-bankrupt defendants.

24          We think, your Honor, that the debtors were subject to

25   all the same practices, I'll call them, in the tort system that

1   came to light in the Garlock case and those cases were, you

2   know, a complete picture of the claimants' exposure history was

3   available, the inconsequential contribution of the debtors'

4   equipment to the claimants' asbestos exposure was self-evident

5   when compared to the claimants' exposures to friable thermal

6   insulation that inevitably caused their disease.  But again,

7   the primary defendants were no longer available.

8          So the plaintiffs' failure to divulge that evidence

9   left the debtors with the need to either incur staggering legal

10  expenses to develop that, develop that exposure evidence, which

11  is very difficult to do, or just simply resolve claims to avoid

12  those legal fees and the risk at trial that there was an

13  incomplete picture in front of the jury. The debtors do detail

14  in the Information Brief that we filed cases where they have

15  found, specific cases where we have found we've been subject to

16  those practices just based on the Garlock outline.  Discovery

17  in this case could obviously produce many more examples.

18          So that was the situation that Aldrich and Murray

19  would find themselves now in the post-bankruptcy wave in the

20  tort system.  So what became their defense strategy?

21          Well, cost of defense is, of course, of necessity, a

22  critical factor when considering how to resolve a claim.  On

23  average, the debtors found that plaintiffs were willing to

24  accept, roughly, on average, mid-five figures to resolve a

25  mesothelioma claim.  We think that's a recognition that

1  plaintiffs weren't asserting that Aldrich and Murray were truly

2  the cause of mesothelioma because, as your Honor may be aware,

3  actual liability for a mesothelioma claim can be a multi-

4  million dollar affair.  But the more important point, I

5  suppose, your Honor, is mid-five figures is a small fraction of

6  the cost of taking a case all the way to trial.  Again, as

7  indicated, taking one mesothelioma case to trial could cost a

8  million dollars or more.

9       So a mid-five figure settlement obviously made sense

10  in many circumstances for the debtor to avoid the cost of

11  taking a case fully to trial and also to avoid the situation

12  where you could be in front of the jury with an incomplete

13  picture because the primary defendants were no longer in the

14  tort system.  All told, the debtors roughly resolved 99 percent

15  of their claims where they actually made a payment for less

16  than $250,000, an amount, again, that is still a small fraction

17  of the cost that it would have taken in terms of the legal fees

18  to get a case to trial.

19       So that was, overall, the debtors' defense strategy

20  for a period of time and it seemed fine, your Honor, if at some

21  point the process was going to end, but the problem that the

22  debtors have today is even settlements in the mid-five figure

23  range still mean the debtors are spending about a hundred

24  million dollars a year in the tort system, roughly $70 million

25  in indemnity and $25 million in defense costs.  So that's,

 1   roughly, a hundred million dollars per year.  Given that the

 2   equipment that they manufactured decades ago or given that the

 3   equipment that had asbestos-containing products was

 4   manufactured decades ago, one would expect that the number of

 5   mesothelioma claims would go down over time.  It would go down

 6   precipitously, but that just has not occurred.  Instead,

 7   debtors continually get, roughly, 2500 claims, 2,000 to 2500

 8   claims every year like clockwork, every hour of every day of

 9   every week, year after year.  And as I said before, your Honor,

10   mesothelioma is here to stay, even if it's not associated with

11   occupational exposure.  There will be mesothelioma cases going

12   on for some period of time.  If this high level of mesothelioma

13   claims continue, it will remain cheaper for the debtors to pay

14   modest settlements to resolve claims than to spend the very

15   significant legal costs of taking those cases to trial and this

16   process will go on year after year after year, many expect for

17   at least three, maybe four more decades, at which point the

18   debtors will have been involved in asbestos litigation for 70

19   years, your Honor.  At this point they, the debtors, have paid,

20   roughly, $1.3 billion in total indemnity for asbestos claims

21   from inception and $600 million in defense costs.  That's

22   before insurance recoveries.  They currently have pending 8200,

23   roughly, mesothelioma claims and, roughly, 100,000 total

24   claims, close to, maybe, 40 percent of which are actually on

25   inactive dockets or in inactive cases.

1          So with that situation, where the debtors found that

2     they were just receiving thousands of mesothelioma and other

3     claims every year and were forced for the reasons mentioned to

4     often just settle those claims because it was much more

5     expensive to take them to trial or to otherwise deal with them,

6     they decided it made sense to start thinking about a more

7     rational, or a rational way to deal with what was, again,

8     becoming a 70-year litigation.  The debtors have filed these

9     chapter 11 cases to instead achieve a rational resolution of

10    the asbestos litigation through the statute that Congress

11    created, section 524(g), to reach exactly that result.  The

12    tort system in many ways, your Honor, is not even beneficial

13    for claimants.  There have been studies shown that of the costs

14    that defendants spend in the tort system, roughly, or I would

15    at least say less than half the spending that was on the

16    defense side actually goes to claimants.  A lot of the money is

17    spent on defense fees and other things.  A lot of the money

18    does not find its way into the hands of the actual claimants.

19    Instead, 524(g)'s collective process provides the best

20    mechanism to do a holistic and global resolution of the

21    situation in front of us.  The debtors intend to fund a section

22    524(g) asbestos trust in an amount that will fully compensate

23    all legitimate claimants and the claimants will then have an

24    administrative process rather than the tort system.  They'll

25    have access to a trust where they can file claims and quickly

1  receive compensation once they show sufficient medical and

2  exposure criteria.  They will avoid the cost and delay of

3  litigation and will, hopefully, be able to recover much more

4  quickly than they have been able to in the tort system to date.

5  The debtors are committed to achieving this result as soon as

6  possible, that is, a section 524(g) trust that has been

7  negotiated with the representatives of the asbestos claimants.

8           With that, I do want to mention a couple other things

9  and then get to the motions.  As I think your Honor is aware,

10  this is what we might call a divisional merger case, same type

11  of situation as in DBMP.  Once it was decided that a 524(g)

12  result might be a better option than the tort system, two

13  divisional mergers were accomplished on May 1, 2020.  Two

14  companies at the time had the asbestos claims asserted against

15  them.  Those two companies -- there's been a lot of name

16  changes, but I'm going to give you the names that make the most

17  sense.  Trane Technologies Company LLC and Trane U.S. Inc. were

18  two companies that had asbestos claims against them.  Those two

19  companies underwent divisional mergers.  The companies ceased

20  to exist and two new companies were created, the New Trane

21  Technologies Company LLC and then debtor, Aldrich, became

22  debtor Aldrich, and then Trane U.S. Inc. is the other company

23  that had asbestos claims against it.  It did a, it did a

24  divisional merger.  It ceased to exist and two new companies

25  were created, Trane U.S. Inc., the New Trane U.S. Inc. and then

1  Murray which, again, became the debtor in this case.  All this

2  is spelled out in the declaration of Ray Pittard, the

3  companies' Chief Restructuring Officer.  There's also a

4  corporate chart that lays this out a little bit more

5  specifically.

6       In the divisional merger -- I'll take the Aldrich side

7  as an example -- Aldrich was allocated a certain amount of

8  cash, a hundred percent interest in an operating company, and a

9  substantial amount of insurance.  I haven't mentioned insurance

10  to date, your Honor --

11       THE COURT:  Uh-huh (indicating an affirmative

12  response).

13       MR. ERENS:  -- but both these companies have

14  substantial insurance assets.  In the case of Aldrich,

15  insurance with a sort of a nominal amount, for lack of a better

16  word, of $750 million.  The asbestos liability was allocated to

17  Aldrich.  All the other assets and liabilities were allocated

18  to New Trane Technologies Company.

19       Same situation on the Murray side.  Murray is

20  allocated a certain amount of cash, a substantial amount of

21  insurance, and also a hundred percent interest in an operating

22  subsidiary.  It was allocated the asbestos liability and New

23  Trane U.S. Inc. was allocated the other assets and liabilities.

24       Most importantly, as is the case in DBMP and the other

25  divisional merger cases, each of the debtors was a recipient of

1    a funding agreement and there was an objection filed this

2    morning by certain representatives of the plaintiffs that talk

3    about the funding agreement.  I think we'll be talking about

4    that more when we get to the preliminary injunction phase of

5    this proceeding, but I wanted to point out a couple of things.

6           So the funding agreements are uncapped obligations of

7    the two relevant nondebtors to provide funding for the case and

8    for a 524(g) asbestos resolution of the case, as set forth in

9    the agreements.  There are allocations [sic] in the pleadings

10   that were filed this morning that provisions of the funding

11   agreements in this case somehow divested the Court of

12   jurisdiction for approval of that 524(g) result or otherwise

13   had some untoward purpose.  And I want to make it clear, your

14   Honor, that is absolutely not the case.  There were two

15   provisions that were pointed to and I'll explain them quickly

16   right now, but the facts I will talk about in the preliminary

17   injunction.

18          One provision simply provides that at the end of the

19   day when the non-debtor payor under the funding agreement funds

20   whatever may be necessary based on the deal between the debtors

21   and the claimants, that the funder will get a 524(g)

22   injunction.  Your Honor, that's the way all cases work.  It

23   would be illogical to believe that a deal would be cut where a

24   third party would fund whatever was agreed to among the

25   parties, would provide that money into a 524(g) trust, and then

1    after confirmation could still be chased for more money.  That,

2    that is illogical, not the way any of these cases have ever

3    worked, and is simply a clarification of what everybody

4    understands, which is once there's a deal the funder will pay

5    the amount in and will get a 524(g) injunction.

6            Similarly, there was a statement that the funding

7    agreement expires on, upon the effective date of the plan when

8    the funding occurs.  The same, same point, your Honor.  Once a

9    deal is reached, the, the party under the funding agreement

10   will pay in whatever the deal is and then will be released from

11   the funding obligation.  There was a point that, well, that

12   would prevent the defunding over time under the funding

13   agreement.  The parties, of course, could always agree that the

14   funding will go in not all in the front of the case or at the

15   beginning of the, the trust or at confirmation, but over a

16   period of years thereafter.  That can always be negotiated,

17   your Honor.  We would think the plaintiffs would actually want

18   the money upfront but if they wanted it over time, that's

19   simply something that can be discussed at the time.

20           So there was no attempt through those provisions,

21   which I think are just clarifications, in the funding agreement

22   to do anything other than what is typically done in funding

23   agreements in other cases which is provide the exact same

24   paying power to the asbestos claimants in these cases and the

25   exact same assets available to them that they had prior to the

1  divisional mergers.

2         Finally, your Honor, I wanted to go quickly into the

3  plan for the case.  This is at the end of the Information

4  Brief.  I won't spend a lot of time on it.  But, your Honor,

5  most importantly, we're ready to deal.  We want to get these

6  cases moving.  We want to get a result as soon as possible.

7  There's allegations in the objections that were filed that we

8  want to, that we want to drag out this case.  Quite the

9  contrary.  We are ready to sit down with the representatives of

10  the plaintiffs and talk about all issues as soon as possible.

11         The first step in the case, though, is the preliminary

12  injunction and I won't go into the specifics, as I'm sure we'll

13  be spending a lot of time on that later in the case.  Soon, the

14  ACC will be formed, the Asbestos Claimants' Committee.  We will

15  sit down immediately with them and talk about various issues,

16  including information we'll need in the case and as well about

17  how to reach resolution upon a future claims representative.

18  We'll get a future claims representative appointed and then

19  we'll have both the representatives of other claimants, current

20  and future, to sit down and talk about how this case is going

21  to proceed.  Again, I'm sure they'll want lots of information

22  and we're ready to proceed with them.

23         But we do, also, at the same time want to move the

24  case forward, your Honor, and ultimately, these cases have a

25  lot to do with just the determination of what the liability in

1   the case really is.  That is, fundamentally, the big dispute in

2   these cases and while we're willing to negotiate at any time

3   with the current and future representatives, to the extent

4   we're not able to reach a deal upfront, we would like to move

5   the process to an estimation or some other type of liability

6   determination process so that the case will not linger and

7   we'll get promptly to some type of result on the backend.  Once

8   that process unfolds and is resolved or settled, however it

9   comes out in the case, hopefully, there's a deal between the

10  debtor and the representatives of the claimants.  We can both

11  negotiate, document, and solicit a plan and then we can exit

12  your Honor's court.

13         So we would like to move the cases as quickly as

14  possible.  We know we've got a lot of work in front of us, but

15  we are committed to doing so and we are committed to run this

16  case as promptly as possible.

17         So with that, your Honor, unless you have any

18  questions, I would turn to Mr. Cody to start the presentation

19  on the motions to be heard today.

20         THE COURT:  Hold on for --

21         MR. MACLAY:  Your Honor?

22         THE COURT:  Hold on for a moment.  Let me see if

23  anyone else wants to make an opening statement.

24         Mr. Maclay?

25         MR. MACLAY:  Absolutely, your Honor.  I certainly do.

1    And let me just clarify for your Honor as a convenience sort of

2    the breakdown that you'll be hearing today from the Certain

3    Asbestos Claimants.

4            THE COURT:  Uh-huh (indicating an affirmative

5    response).

6            MR. MACLAY:  I will be addressing these overview

7    comments that we've just heard from the debtor; my colleague,

8    Natalie Ramsey, will be addressing the TRO/PI motion in detail;

9    and my colleague, Dave Neier, will be handling the debtors'

10   declarations and any cross-examinations that are necessary.

11           So that's how we have whacked it up, your Honor, to

12   make this as efficient as possible, given, obviously, the short

13   time that we've had to prepare.

14           THE COURT:  Okay.

15           MR. MACLAY:  So, so to start, your Honor, I am here,

16   as are my colleagues, on behalf of the asbestos victims

17   represented by 15 law firms identified in our papers and in the

18   related joinder.  Those firms are, would be familiar to your

19   Honor as they also represent, in, in most cases, committee

20   members in Kaiser, Bestwall, CertainTeed, or some combination

21   of the three, and it is certainly clear, your Honor, that we're

22   starting to see a pattern emerge in how cases that are being

23   presented to your Honor in the workup before the bankruptcy

24   filings.  It's starting to have some similarities, although as

25   we pointed out in our brief, also some important differences.

1   But before getting into that, your Honor, there are some basic

2   points that were made by debtors' counsel that need to be

3   discussed.

4         You heard from debtors' counsel about what I would

5   characterize, your Honor, as the chrysotile defense and the

6   encapsulation defense --

7         THE COURT:  Uh-huh (indicating an affirmative

8   response).

9         MR. MACLAY:  -- arguments that, although they paid, by

10  my count, $1.9 billion before this filing, somehow they're just

11  not really that responsible.  That's an argument that they make

12  and lose in the state court system all the time and that's why

13  they're here, but the reality is your Honor should not give

14  credence to the concept that someone who has paid $1.9 billion,

15  whom debtors' counsel just told you it's about a, a hundred

16  million per year now, doesn't have substantial asbestos

17  liability.  Of course they do.

18        And, your Honor, it is not the, the province of this

19  Court nor an appropriate use of bankruptcy to come into

20  bankruptcy to argue that the state tort system is flawed, that

21  it doesn't work, and that it's unfair.  The state tort system

22  is what it is.  It is under our country's separation of powers

23  the institution that deals with liabilities for mass torts.

24  And so whatever the debtors' purposes of coming here were --

25  and we'll talk about those more -- certainly the idea that they

1  could ask this Court to ignore and wipe out state court results

2  under the state laws is certainly inappropriate and would be

3  unprecedented if accepted and the various arguments made about

4  chrysotile and encapsulation defense, those are arguments, your

5  Honor, properly made to the state courts, as they have been,

6  again, as I mentioned, unsuccessfully.

7         Now, your Honor, they talk a bit, really, in two

8  different, somewhat inconsistent ways about their vision of the

9  case.  On the one hand, they talk about how they're, they're

10  willing to deal.  They have come here to work something out

11  with the claimants.  Your Honor, a debtor that wants to work

12  things out with the claimants -- and this is, you know, the

13  subject of a whole lot of precedent out there -- does something

14  that's called a prenegotiated or prepack plan.  They reach out

15  to the constituents, they get their respective experts

16  together, and they analyze what the liability should be and if

17  they work out a mutual understanding that's consistent with

18  what they think would happen in the tort system, they file the

19  case consensually.

20         What they have done here is quite different.  They

21  have engaged in what we have called for you before the "Texas

22  two step," a very, frankly, transparent attempt to separate

23  assets from liabilities in a way that numerous laws, we

24  believe, would preclude being effectuated in bankruptcy.  And

25  so this is not a case in which the debtor has indicated in

1    their Information Brief, or otherwise, that this is an actual

2    attempt to resolve their asbestos obligations in any sort of

3    consensual fashion.

4            Instead, the other thing that they said, which,

5    frankly, I would pay a lot more attention to, your Honor, it's

6    a discussion of (inaudible) and, and how they would like this

7    case to proceed with respect to an estimation if they can't

8    get, presumably, whatever sweetheart deal they think they could

9    get because of the leverage that they think they have gained

10   through their corporate organizational package.

11           But as your Honor knows, first of all, as your Honor

12   has said, the Garlock decision was written narrowly, but has

13   been interpreted broadly and that's exactly what they're doing

14   here, your Honor.  They trying to interpret Garlock broadly.

15   They're trying to take, you know, 15 out of hundreds of

16   thousands of cases and try to ask you to draw conclusions from

17   them, even though the underlying plaintiffs and their attorneys

18   weren't even parties to that proceeding.

19           But even more fundamentally, your Honor, besides the

20   unfairness of attempting to draw conclusions about the entire

21   state tort system with respect to a different set of debtors

22   and a different context, the other thing to keep in mind about

23   Garlock was that case took seven years.  It took hundreds of

24   millions of dollars in professionals' fees.  They had an

25   estimation proceeding which was ultimately irrelevant to the

1    final settlement, which was, as your Honor knows, four times

2    higher as much as, you know, the debtor was effectively capable

3    of paying.  And so the idea that is a useful path to take, an

4    appropriate path to take, it isn't, your Honor.  It has already

5    been shown to not be an appropriate path to take.

6          And so, really, what we should be focusing on here,

7    your Honor, is how it is that the debtors are attempting to

8    skew the normal bankruptcy procedures and processes and the

9    normal bankruptcy law to disadvantage asbestos claimants and to

10   advantage themselves.  As your Honor knows, this is now the

11   third time that you have seen a transaction employed to

12   separate assets from liabilities so as a previously non-

13   existent debtor from a solvent entity in the context of an

14   asbestos bankruptcy.  And, your Honor, you're familiar with the

15   other two, but just to say them for the record, Georgia-Pacific

16   gave rise to Bestwall, currently pending before Judge Beyer,

17   and CertainTeed gave rise to DBMP, currently pending before

18   your Honor.  Now Trane has done it.  They've created these two

19   debtors, Aldrich Pump and Murray Boiler.

20         Your Honor, today, we are on the precipice of allowing

21   what is supposed to be extraordinary relief, relief of

22   injunction, and previously unprecedented under circumstances

23   like these to become the standard operating procedure in the

24   Western District.  We are concerned that, now that this pattern

25   has emerged and become clear, that it is important that we, we

1    put a stop to it, your Honor, now before this trend continues

2    and, and exacerbates the already existing harm.

3         Now let's think about the corporate transaction that

4    you heard described by the debtors' counsel for a minute, your

5    Honor.  Why bother with all these corporate machinations if the

6    entity who holds the valuable assets is the one who will be

7    paying for these asbestos obligations in full, anyway?  The

8    answer, your Honor, when you think about it, is clear.  It's to

9    pose an obstacle to the ability of asbestos claimants.  It's to

10   hinder, delay, and defraud them, to put that another way.

11   These cases are all about impending relief for the non-debtor

12   parents, the ones that got the assets, and that has been made

13   expressly clear by the structure of the funding agreement,

14   which is even more explicit here than it was in the other two

15   cases.  It's even changed in a very fundamental way by

16   conditioning their funding of the debtors' liabilities on the

17   type of relief you only get under 524(g) and, and only those

18   parents get it.

19        You heard, your Honor, by the way, something to the

20   effect of that's the way all these cases work.  No, it isn't,

21   your Honor.  Just a couple of months ago, the Septo (phonetic)

22   bankruptcy was confirmed and it, and it did not include a

23   contribution from, or protections for, any of the debtor's

24   affiliates.  And, of course, what they're really saying is they

25   get to protect the assets of these nondebtors, even though

1    those nondebtors have chosen to keep those assets out of

2    bankruptcy, even though they have chosen to, essentially, have

3    their cake and eat it, too, by putting the -- the -- only the

4    liabilities into bankruptcy, but keeping the assets out.  That

5    is what your Honor recognized was unusual in the CertainTeed

6    case at the beginning and it's become not only unusual, in

7    general, but even more inappropriate as it's become clear how

8    these procedures are actually being implemented to disadvantage

9    asbestos claimants.  It's an attempt to gain inappropriate

10   leverage, your Honor, and it's very evident, if you looked at

11   Paragraph 13 in the first day declaration, you'd see that the,

12   the debtors described the purpose of the restructuring

13   transaction as being to avoid "unnecessarily subjecting the

14   entire Old IRNJ and Old Trane Enterprises and their many

15   employees, suppliers, vendors, and creditors to a chapter 11

16   proceeding."  In other words, your Honor, for the debtors'

17   affiliates with nearly all the assets, full steam ahead, but

18   for the asbestos creditors, full stop.  It is an attempt to

19   have all the benefits of bankruptcy accrued to the non-debtor

20   affiliates and all the detriments of bankruptcy fall upon the

21   innocent asbestos victims.

22        And it is important to know that what they are seeking

23   to do here is to have those non-debtor entities permanently rid

24   themselves of liability for their past actions and to provide a

25   windfall, your Honor, to shareholders, but, of course, the

1   debtors concede that many of these creditors have mesothelioma

2   and always fear fatal cancer.  Timely compensation for victims

3   like that can make the difference between a more or less

4   comfortable end of life.  It, it is certainly just not

5   equitable, your Honor, for the debtors' machinations

6   prepetition to enable them to keep the assets separated from

7   the liabilities to get the benefits of bankruptcy, but not its

8   detriments.  That's not the way the system is supposed to work

9   and, of course, my colleague, as I mentioned, Natalie Ramsey,

10  is going to be going through the legal test for a TRO and why

11  it's not met here in some detail.

12          But just a very general point, your Honor, is the fact

13  that if the debtor were able to accomplish here what they seek

14  to accomplish and be able to not only gain the protections of

15  the automatic stay and injunctive relief, but they would skirt

16  essential bankruptcy court protections for creditors, such as

17  debtor transparency, court supervision, and the absolute

18  priority rule.  They would be free to give dividends to their

19  shareholders, upstream cash to affiliates, and then, of course,

20  ultimately, seek a substantial bankruptcy discount from the

21  asbestos victims who are, whose claims are frozen while the

22  debtor goes about its business -- well, the nondebtor,

23  actually, more importantly -- go about their business as, as

24  prepetition.

25          Your Honor, in closing from this opening statement, it

1   is axiomatic that a person seeking equitable relief has to do

2   equity and the debtors' conduct in separating the principal

3   operating assets from their asbestos liability and seeking to

4   confer the benefits of bankruptcy without the attendant burden

5   for nondebtors is inherently unfair and inequitable and as my

6   colleague, Ms. Ramsey, will further explain in detail, under

7   the specific governing principles of law and equity this Court

8   should deny the requested TRO today.

9           Thank you.

10          THE COURT:  There was another group of claimants.

11  Ms. Simpson, did you have anything you, you folks wanted to

12  say?

13          MS. SIMPSON:  Your Honor, I don't believe we need to

14  make an opening statement at this point.  I'll reserve.  Thank

15  you.

16          THE COURT:  Anyone else?

17      (No response)

18          THE COURT:  Okay.  Let's go to the, to the agenda and

19  see what we have to talk about today.

20          Back to the debtor.  Mr. Erens?

21          MS. CAHOW:  Good afternoon.  Again, for the record,

22  your Honor, this is Caitlin Cahow of Jones Day on behalf of the

23  debtors.

24          THE COURT:  Okay.

25          MS. CAHOW:  And before we get started, I'll be taking

1   the Court through the first three motions on the agenda and

2   I'll turn to my colleague, Mr. Cody, to take Items 4 and 5.

3        And this doesn't, this doesn't directly affect the

4   first couple of motions on here, but I just want to make sure

5   that your Honor was able to get a copy of the revised agenda

6   that was filed shortly before the hearing.

7        THE COURT:  I did.  I've managed to misplace it here

8   in the last couple minutes, but as soon as I get back to where

9   we were, let's see.  I have too many papers.

10        Thank you.  All right.  Now we're good.

11        Ms. Cahow?

12        MS. CAHOW:  Thank you, your Honor.

13        So unless you would prefer a different order, I'm

14   happy to take these in the order they appear on the agenda.

15        THE COURT:  I have no preference.

16        How about the others?  Anyone else?

17     (No response)

18        THE COURT:  Let's start at the top, then.

19        MS. CAHOW:  Great.

20        So, your Honor, Item No. 1 on the agenda is the joint

21   administration motion.

22        THE COURT:  Uh-huh (indicating an affirmative

23   response).

24        MS. CAHOW:  And by this motion debtors are seeking

25   joint administration of their cases for procedural purposes

1    only.

2            THE COURT:  Uh-huh (indicating an affirmative

3    response).

4            MS. CAHOW:  That's pursuant to Rule 1015(b) and Local

5    Bankruptcy Rule 1015-1.

6            Debtors also propose a consolidated case caption and

7    request that the Court find that the proposed caption satisfies

8    the requirements of section 342(c)(1).

9            Your Honor, we believe that the relief will provide

10   various benefits related to administrative efficiency and that

11   the rights of the parties won't be prejudiced.  This motion

12   does not seek substantive consolidation of the debtors'

13   estates.

14           We believe this to be a fairly straightforward request

15   for relief and unless your Honor has any questions, we would

16   ask that the Court grant the motion.

17           THE COURT:  Let me ask.  Do -- are there other parties

18   that wish to weigh in on this particular motion?

19       (No response)

20           THE COURT:  Perhaps what I should have said first --

21           MS. RAMSEY:  Your Honor, on behalf --

22           THE COURT:  Yes.  Ms. Ramsey?

23           MS. RAMSEY:  Oh, I'm sorry.

24           THE COURT:  Go ahead.

25           MS. RAMSEY:  Thank you, your Honor.  Natalie Ramsey

1   for the Certain Asbestos Claimants.

2        Your Honor, we would only ask your Honor for an

3   opportunity for any official committee that is appointed to

4   weigh in on this motion.  It is not clear to us at this point

5   in time whether there are sufficient overlapping issues and

6   overlapping assets, that it would make sense to have these

7   cases jointly administered.

8        THE COURT:  Okay.

9        What I was going to say before that was the -- I

10  should have asked.  We have a, a first day declaration.  Is

11  anyone opposed to treating that as the, the direct examination

12  of the debtors' witnesses, witness or witnesses, depending, and

13  then allowing cross-examination if there's a desire to do so?

14  Pretty much standard procedure, I think, in these types of

15  cases.

16     (No response)

17        THE COURT:  I don't hear anyone objecting.  So we're

18  going to allow that right out of the gate and then if there's a

19  request for other evidence, please let me know on a particular

20  motion.

21        Anyone else on this motion?

22        MS. ABEL:  Your Honor, this is --

23        THE COURT:  Ms. Abel, uh-huh.

24        MS. ABEL:  Sorry, your Honor.  This is Shelley Abel.

25        In furtherance to the comment that was made by

1   Ms. Ramsey, I just wanted to let the Court know that I spoke

2   with the debtors' representatives earlier today and had asked

3   that we enter an order that might provide the ACC, once it is

4   formed, to revisit any of the orders that are entered today or

5   those that have been entered on an ex parte basis on a,

6   previously, so as to permit them an opportunity to review

7   those, even if the committee is formed past the normal 14-day

8   response --

9           THE COURT:  Uh-huh (indicating an affirmative

10  response).

11          MS. ABEL:  -- period.

12          So we would just note that request and we have

13  preliminary agree, preliminarily agreed that we would enter

14  into some sort of consent order that we would submit to the

15  Court that would address that concern.

16          THE COURT:  Ms. Cahow?

17          MS. CAHOW:  And, your Honor, that's correct.  And

18  we're --

19          THE COURT:  I'm sorry?  We -- you, you said something.

20  We lost you.

21          MS. CAHOW:  We're --

22          THE COURT:  One moment.  Looks like we're having tech

23  issues.

24          MS. CAHOW:  I think I'm back, your Honor.  Let me --

25          THE COURT:  And froze again.

1       (Pause)

2               MR. LAMB:  She's dropping.

3               THE COURT:  Okay.

4               MS. CAHOW:  I, I think I'm back.  Is that, that

5   working?

6               THE COURT:  Yes, it is.

7               MS. CAHOW:  Wonderful.  Thank you, your Honor.

8               And what I was about to say is that we, we did, in

9   fact, speak with Ms. Abel and we're happy to (indiscernible).

10              THE COURT:  All right.

11              And, and as always, when we enter ex parte orders of

12  these first day hearings, we normally under Local Rule reserve

13  14 days for those who might not have gotten the news that we

14  were here to take a look at them and seek reconsideration as

15  well.

16              But otherwise, anyone else opposed to this particular

17  motion, joint administration?

18      (No response)

19              THE COURT:  That is approved on an interim basis and

20  subject to the criteria we just announced.  All right.

21              MS. CAHOW:  Thank you, your Honor.

22              The next item on the agenda is the application to

23  retain and employ Kurtzman Carson Consultants LLC, or KCC, as

24  claims, noticing, and ballot agent in these cases.

25              THE COURT:  Uh-huh (indicating an affirmative

1  response).

2        MS. CAHOW:  And as Mr. Erens alluded to and as your

3  Honor would have read in our papers, the debtors anticipate

4  these cases will involve many thousands of potential creditors

5  and other parties in interest and in light of the significant

6  administrative burdens that that would place on the Court and

7  the clerk's office and, and also the debtors, we believe that

8  having a claims, noticing, and ballot agent in the cases, in

9  these cases is appropriate and, and, in fact, necessary.

10        THE COURT:  Uh-huh (indicating an affirmative

11  response).

12        MS. CAHOW:  And as your Honor is no doubt aware, this

13  is fairly typical relief in large cases to relieve the clerk's

14  office, in particular, of administrative duties.  We also

15  believe that appointment of KCC will expedite service,

16  streamline the claims and solicitation processes and generally

17  promote administrative efficiency.

18        So we filed this application pursuant to 28 U.S.C.

19  156(b), which, as the Court is aware, empowers the Court to

20  authorize the use of outside agents and facilities for

21  administrative purposes.

22        Rule 2002 also allows the Court to direct other

23  parties to give notice.

24        So we believe there's ample authority to request the

25  relief.

1          The KCC service agreement is attached as Exhibit A to

2    the application.   Paragraph 10 of the application also

3    discusses the services that KCC may perform in these cases and

4    it goes into some detail, your Honor, and I'm happy to go into

5    as much detail as you'd like, or just give a general overview.

6    I'm guessing your Honor has seen a few of these requests

7    before.

8          THE COURT:   Uh-huh (indicating an affirmative

9    response).

10          MS. CAHOW:   Generally, KCC will be able to assist with

11   serving notices, maintaining service lists and claims

12   registers, providing balloting and tabulation services,

13   including a tabulation certification (indiscernible).   They'll

14   also be able to assist further administrative functions.   In

15   fact, KCC maintains a website that's currently live and

16   available now so that interested parties can access information

17   and download documents filed in these cases free of charge.

18          The debtors are seeking to pay for these services in

19   the ordinary course of business.   We would have KCC's fees and

20   expenses treated as administrative expenses in these cases.

21          So while the, while KCC would not file fee

22   applications, KCC would provide invoices both to debtors and to

23   the Bankruptcy Administrator so that the Bankruptcy

24   Administrator can see those costs.   And as required by 28

25   U.S.C. 156(b), of course, the debtors will pay all of the costs

1   of KCC's services.

2           This is laid out in the application, but I did want to

3   flag for the Court that KCC is holding a $60,000 pre-petition

4   retainer --

5           THE COURT:  Uh-huh (indicating an affirmative

6   response).

7           MS. CAHOW:  -- and our application does request that

8   KCC be authorized to hold on to that retainer throughout these

9   cases.  We spoke about this briefly with Ms. Abel this morning

10  and we believe this to be consistent with similar relief

11  granted in this District.

12          I also would note, your Honor, that though we are not

13  seeking retention under 327, KCC did file a declaration in

14  support of the application --

15          THE COURT:  Uh-huh (indicating an affirmative

16  response).

17          MS. CAHOW:  -- and that declaration can be found at

18  Exhibit B to the application and it was signed by Robert

19  Jordan, who is a Senior Managing Director of Corporate

20  Restructuring Services at KCC, and you'll see Mr. Jordan is

21  available on this Zoom call to the extent that your Honor has

22  any questions.

23          THE COURT:  Okay.

24          Others?  Anyone --

25          MS. CAHOW:  I --

1          THE COURT:  -- want to weigh in on this?

2       (No response)

3          THE COURT:  Everyone good with this motion?

4       (No response)

5          THE COURT:  Okay.

6          MS. ABEL:  Your Honor, no objection from the

7   Bankruptcy Administrator's Office.

8          THE COURT:  All right.

9          Given the number of participants, don't tell me if you

10  don't object.  I just need to hear if you want to ask questions

11  or, or weigh in on the, on the motions.

12         Anyone else?

13      (No response)

14         THE COURT:  Okay.  This one is approved.

15         MS. CAHOW:  Thank you, your Honor.

16         THE COURT:  Thank you.

17         MS. CAHOW:  Item No. 3 on the agenda is a motion that

18  really seeks four buckets of relief and this is fairly standard

19  relief, we think.

20         First is authority to file a consolidated master list

21  of creditors.  The second is authority of file what we define

22  in the motion as the top asbestos counsel list in lieu of the

23  typical Top 20 List for each debtor.  We also seek approval of

24  certain notice procedures for asbestos claimants and approval

25  of the form and manner of notice of the commencement of these

1  cases.

2       So each of the forms of relief requested in the motion

3  is likely familiar to your Honor.  It's similar to what your

4  Honor would have seen in Kaiser and DBMP.

5       With respect to the consolidated creditors list, the

6  debtors believe that the relief will further administrative

7  efficiency and is generally appropriate under the circumstances

8  in these cases.

9       With respect to the request regarding the top asbestos

10  counsel list, what we're seeking here, your Honor -- and it's,

11  it's spelled out in greater detail in our, in our papers -- is

12  we're seeking to file a consolidated list of 20 law firms with

13  significant representations of parties with asbestos claims

14  against the debtors and that would be in lieu of lists of the

15  creditors that have the 20 largest unsecured claims against

16  each debtor and given the nature of the cases and the fact that

17  the overwhelming majority of the debtors' creditors are

18  asbestos claimants, we anticipate that an asbestos committee

19  will be formed.  We spoke, again, briefly this morning with

20  Ms. Abel to that effect.  We do not believe that a separate

21  general unsecured creditors' committee will be formed in these

22  cases.

23       And so with that in mind, we believe the top asbestos

24  counsel list will be more helpful to the Bankruptcy

25  Administrator and will provide the information necessary to

1    evaluate and form an asbestos committee representative of the

2    claimants of each of the debtors in these cases.  And we laid

3    out a few of these facts in the motion, your Honor, but just to

4    give a few examples.  The top asbestos counsel list consists of

5    the 20 law firms representing the largest number of claimants

6    in asbestos lawsuits in which the debtors are defendants.  And

7    collectively, the law firms on this list represent claims in

8    over 80 percent of those lawsuits.

9           So there is substantial overall representation on the

10   list.  If you were to break that out by debtor, if you were to

11   try to put together a Top 20 List for each debtor, 16 of the 20

12   law firms that represent the most asbestos claimants in

13   lawsuits against Aldrich and 17 of the 20 law firms that

14   represent the most asbestos claimants in lawsuits against

15   Murray appear on the top asbestos counsel list that we filed

16   with the petition.

17          So there's significant overlap and also representation

18   between the debtors.  And, just more generally, these firms

19   represent claimants across the various types of alleged harms

20   that are asserted by claimants.  And so that really is, for

21   example, mesothelioma, lung cancer, etc.

22          So, in general, we, we believe this list to be very

23   representative of the claimants in these cases.

24          The third bucket of relief, somewhat relatedly, the

25   debtors are seeking authority to serve asbestos claimants in

1  care of their counsel, again similar to relief that you would

2  have seen in DBMP and Kaiser.  And we believe that this type of

3  service is consistent both with what the law requires and also,

4  our responsibilities under the Rules of Professional Conduct.

5  This is also consistent with the debtors' past practices.  As

6  indicated in our papers, debtors may not have or be able to

7  obtain current contact information for the individual

8  claimants.

9       So we believe that serving claimants through counsel

10  will just be a more efficient, reliable, and appropriate form

11  of relief in these cases.  And in that regard, we've also

12  listed counsel contact information on the creditor matrix.  So

13  it's consistent there and, indeed, our, our service that went

14  out for this first day hearing was to counsel for the asbestos

15  claimants consistent with other requested relief.

16       And then the last form of request for relief is

17  approval of the case commencement notice.  We saw that your

18  Honor already entered the notice suspending entry --

19       THE COURT:  Uh-huh (indicating an affirmative

20  response).

21       MS. CAHOW:  -- and service of the standard notice of

22  commencement, but we attached our proposed form of notice as

23  Exhibit A to the motion and that form is based off of the

24  official form, but there are a, a couple of (indiscernible) for

25  purposes of this, of these cases and really, subject to a

53

1  signoff from the Bankruptcy Administrator -- and we didn't

2  quite get the chance to talk about that this morning when we

3  spoke, but I'm sure we'll have the opportunity to do that

4  shortly -- we would propose to serve this notice out within

5  five business days after we have the information regarding the

6  341 meeting that's required for the notice.

7          And so that, that covers the four buckets of relief.

8  So unless your Honor or anyone else has questions, we would ask

9  that the Court grant the requested relief.

10          THE COURT:  Anyone else want to weigh in on this

11  particular motion?

12          MS. RAMSEY:  Yes, your Honor.  Hi.  Again, it's

13  Natalie Ramsey for the Certain Asbestos Claimants.

14          Your Honor, we heard some clarification on the record

15  today that they had responded to questions that we had, but we

16  did take note that the language of the petition itself with

17  respect to the, to the list of 20 law firms was rather unusual

18  in that there was no representation regarding how those firms

19  were selected.  It simply was referred to as a list of 20 law

20  firms with significant representations of asbestos claimants.

21  Based upon the representation, if, if that is correct that

22  those firms are, indeed, the firms that represent the largest

23  number of pending claimants, we would not expect that we would

24  have an objection, but -- but it was -- it was something that

25  caught our eye and also was something that some of our clients

1  questioned.

2          So I did want to raise for the record that we would

3  expect that a committee would want an opportunity to ensure

4  that, in fact, the firms are representative of, as indicated by

5  the debtors.

6          THE COURT:  Okay.

7          Anyone else?

8          MS. ABEL:  To that --

9          THE COURT:  Yes.

10          MS. ABEL:  Your Honor, this is Shelley Abel.

11          To that point, I have requested from the debtor to

12  receive a comprehensive listing in a more usable format than

13  that was provided in the adversary proceeding so that I can

14  review those, the pending claims against the debtor in order to

15  sort of assess the selection of the top 20 law firms that were

16  provided.

17          And I expect that there may be an opportunity for

18  further discussion in connection with a motion to appoint the

19  ACC in this case.

20          THE COURT:  Anyone else?

21     (No response)

22          THE COURT:  Back to you, Ms. Cahow.  Is that -- I

23  think I read what was stated in the, in the declaration that,

24  that these were, in fact, the firms that represented 80 percent

25  of the clients if it wasn't stated in the petition, is that

1   correct?  It was in the declaration, originally?  I saw it

2   somewhere.

3          MS. CAHOW:  Yes.  It's in the language -- that

4   language itself is in the motion as well, your Honor.

5          THE COURT:  Okay.  But that is, in fact, the debtors'

6   representation?

7          MS. CAHOW:  Yes, your Honor.  That's correct.  And I

8   believe -- and I, I apologize to Ms. Ramsey if, if this is not

9   the case -- but I believe that the language regarding -- let me

10   just flip to the appropriate paragraph here.  Paragraph 11 of

11   the motion, your Honor, and my recollection was that the

12   language included with the petition so that the top asbestos

13   counsel list consisted of the 20 law firms representing the

14   largest number of claimants in asbestos lawsuits in which the

15   debtors were defendants.

16          THE COURT:  Uh-huh (indicating an affirmative

17   response).

18          MS. CAHOW:  But I can, I can go back and double check

19   that.

20          THE COURT:  Ms. Ramsey, is that sufficient?

21          MS. CAHOW:  If it did not, we intended, we intended to

22   do that.

23          THE COURT:  Okay.

24          Ms. Ramsey, are you satisfied for present --

25          MS. RAMSEY:  Yes, your --

1            THE COURT:  -- purposes?

2            MS. RAMSEY:  I'm sorry, your Honor.  We had trouble

3    unmuting.

4            Yes, your Honor.  Thank you.

5            THE COURT:  Well, don't feel badly.  We've been doing

6    this for a couple months now and everyone seems to have that

7    problem about muting and unmuting the microphones.

8            All right.  Anyone else?

9        (No response)

10           THE COURT:  If not, the motion is approved.  If you'll

11   send me a proposed order on that.

12           MS. CAHOW:  Thank you very much, your Honor.

13           And with that, I will turn things over to my

14   colleague, Mark Cody, who will address the remaining main case

15   agenda items.

16           THE COURT:  Mr. Cody.

17           MR. CODY:  Good afternoon, your Honor.

18           THE COURT:  Afternoon.

19           MR. CODY:  It's Mark Cody on behalf, on behalf of the

20   debtors here from Jones Day.

21           The next item on the agenda, your Honor, is Agenda

22   Item No. 4, which is the debtors' motion for entry of an order

23   establishing certain case management procedures.  By the

24   motion, your Honor, what we're, what we're seeking to do is, is

25   approve and implement certain notice, case management, and

1    administrative procedures to, effectively, establish various

2    requirements for filing and serving papers filed in these

3    chapter 11 cases --

4              THE COURT:  Uh-huh (indicating an affirmative

5    response).

6              MR. CODY:  -- as well as orders entered in these

7    cases --

8              THE COURT:  Uh-huh (indicating an affirmative

9    response).

10             MR. CODY:  -- set standards for notices of hearings

11   and agendas, fix periodic omnibus hearing dates and provide

12   mandatory guidelines for scheduling hearings and setting

13   various deadlines as well as to minimize, ultimately, to

14   minimize the potential burdens on the Court by limiting matters

15   that are otherwise required to be heard by the Court.

16             The debtors believe that the case management

17   procedures will facilitate the efficient administration of

18   these chapter 11 cases and ensure that appropriate notice is

19   provided to interested parties.

20             We intend to serve the case management procedures on

21   all interested parties as soon as practicable after the entry

22   of the case management order, should you approve it; publish it

23   on the debtors' restructuring website at, with KCC; and then

24   make them available upon request with our claims and noticing

25   agent, Kurtzman Carson Consultants.

1          The ultimate goal here is to figure out a way to, to

2  alleviate significant administrative burdens and cost that

3  otherwise could be imposed on the debtors' estates, parties in

4  interest, the Court, and the Clerk of the Court due to the

5  substantial number of parties in interest expected to be

6  involved in these cases and the number of court filings that we

7  would anticipate as well.  Significantly, your Honor, the case

8  management procedures do not seek to waive any substantive

9  rights of any of the parties in these chapter 11 cases.

10          Similarly, the courts, courts in this District have

11 regularly granted similar relief, including in, in, most

12 recently, in DBMP.

13          Your Honor, the, a copy of the proposed case

14 management procedures are attached to, to the proposed order.

15 Unless your Honor has any questions, we'd respectfully request

16 that the Court enter an order approving the motion.

17          THE COURT:  Okay.

18          Others?

19     (No response)

20          THE COURT:  Anyone?

21     (No response)

22          THE COURT:  I notice there are blanks for omnibus

23 hearing dates that we still need to talk about.  What do you

24 envision there, Mr. Cody?  What are the, the debtors' needs?

25          MR. CODY:  You know, your Honor, we can, we can

1    discuss this now or it might make sense to wait till after

2    we've had -- heard from -- about the, the PI.  So maybe we

3    could do these --

4              THE COURT:  Uh-huh (indicating an affirmative

5    response).

6              MR. CODY:  -- the -- whatever is required in that

7    particular pleading that we have those together.  I think,

8    after that, we would anticipate maybe at the outset a once-a-

9    month to sort of coincide with, with other activity in, in

10   these cases.  To the extent that a matter, a hearing time is

11   not needed, then we would just consult --

12             THE COURT:  Right.

13             MR. CODY:  -- with the Court and then cancel the

14   hearing.

15             THE COURT:  Okay.

16             Everyone else good with holding this until we get

17   through talking about the TRO request?

18       (No response)

19             THE COURT:  That's what we'll do.

20             Otherwise, the, the motion is approved and we'll

21   backfill the dates.

22             MR. CODY:  Thank you, your Honor.

23             THE COURT:  Thank you.

24             What's next?

25             MR. CODY:  The next item, your Honor, is Agenda No. 5,

1    which is the debtors' motion to approve their continued use of

2    their bank accounts, cash management system, and business

3    forms, granting a waiver of requirements under section 345(b)

4    of the Bankruptcy Code, and authorizing the debtors' banks to

5    charge certain fees and other amounts.

6         THE COURT:  Uh-huh (indicating an affirmative

7    response).

8         MR. CODY:  This, as I, as I noted, it sort of falls

9    into four categories of, of relief here.  The debtors are

10   seeking approval to continue to use their current cash

11   management system, existing bank accounts, existing business

12   forms.  They're seeking authority to open and close bank

13   accounts, as necessary and appropriate.  They're seeking a

14   waiver of the requirements under section 345(b) of the

15   Bankruptcy Code and seeking authority for participating banks

16   to honor certain transfers as well as to charge certain bank

17   fees associated with their involvement with the debtors.

18        At the outset, your Honor, relief here is sought under

19   section 345 and section 363 of, of the Bankruptcy Code and at

20   this point I would jump into some background on the, on the

21   debtors' cash management system.

22        THE COURT:  Uh-huh (indicating an affirmative

23   response).

24        MR. CODY:  The debtors maintain three bank accounts at

25   JPMorgan Chase.  Two -- each, each debtor has an operating

1   account that serves as both a, a consolidation -- consolidation

2   -- an operating account that's, that's there for consolidation

3   of funds as well as disbursements.  There's also a dormant

4   account that was originally used by the debtors to service and

5   pay certain asbestos-related claims, including settlement

6   payments.  At present, that, that account has less than $3

7   million in it, but given the filing of these chapter 11 cases

8   and the imposition of the automatic stay, that, that account

9   will now remain dormant and the funds that are presently in

10  there will be returned to the applicable debtors' operating

11  accounts.

12          THE COURT:  Okay.

13          MR. CODY:  The debtors' cash management system is

14  pretty straightforward.  There's a, there's a chart at the back

15  of the motion that highlights --

16          THE COURT:  Uh-huh (indicating an affirmative

17  response).

18          MR. CODY:  -- the system.  It's, as I mentioned, it's

19  very, very simple, straightforward.  There are the three bank

20  accounts, one being the dormant account, the other two being

21  the operating accounts, one with Murray Boiler, one with

22  Aldrich Pump.

23          THE COURT:  Uh-huh (indicating an affirmative

24  response).

25          MR. CODY:  And the parties are, are also party to cash

1   pooling agreements with their non-debtor subsidiaries.

2   Effectively, in order to more efficiently manage funds the

3   debtors and their non-debtor subsidiaries pool their cash in

4   the debtors' accounts to maximize efficiencies of a coordinated

5   cash management system.  The funds are maintained and managed

6   by each respective debtor, but the funds from the non-debtor

7   affiliates remain the property of the non-debtor affiliates at

8   all times, as do the funds of the, the debtors remain property

9   of the debtors' bankruptcy estate.

10          The, the parties, the non-debtor parties monitor their

11   cash in their accounts and then transfer excess cash to the

12   applicable debtors in accordance with the terms of these cash

13   pooling agreements.  The non-debtor entities can withdraw funds

14   or direct the debtors to disburse those funds in accordance

15   with the pooling agreements.  To the extent that a non-debtor

16   subsidiary determines that it will not require subsequent

17   withdrawals or disbursements of its excess cash, it may

18   distribute those funds to the applicable debtor as a dividend.

19          But again, just to be clear, the funds that we're

20   talking about with respect to withdrawals and disbursements are

21   the non-debtor affiliates' cash.  They keep a record of, of

22   the, of the funds and the transactions that relate to those

23   funds.  The debtors' cash remains property of the estate and is

24   not in any, in any capacities funneled down to any of the non-

25   debtor entities.

1      So, your Honor, as, as, as a practical matter, it

2  would be disruptive and administratively burdensome and

3  unnecessary to require the debtors to close their existing bank

4  accounts and open new debtor-in-possession bank accounts.  The

5  debtors use their accounts -- the debtors' use -- I'm sorry --

6  of their, their bank accounts constitute an ordinary course and

7  appropriate business practice of the debtors and authorizing

8  the continued use of the bank accounts will assist the debtors

9  in accomplishing a smooth transition to operating as debtors in

10 possession.  Accordingly, the debtors are seeking authority to

11 continue to use their bank accounts in the ordinary course of

12 business.

13     Secondly, your Honor, the debtors would seek authority

14 to open and close accounts as they deem necessary.  Any new

15 domestic bank account would be established at a bank that is

16 insured by, with the FDIC or FSLIC and is otherwise organized

17 under the laws of the United States or any, any state in the

18 Union.  Moreover, prior to opening or closing a bank account,

19 the debtors will provide notice to the United States Bankruptcy

20 Administrator, the official committee of asbestos claimants

21 appointed in these chapter 11 cases, and the future claimants'

22 representative appointed in these, in these cases.

23     Your Honor, this, this type of authority is, to

24 continue to use bank accounts, is routinely granted and has

25 been granted in other bankruptcy cases in this District.  Your

1  Honor, just to be clear, the, the, the debtors do have in -- in

2  -- a process in place to provide a -- they've had conversations

3  with JPMorgan Chase to ensure that no checks are inadvertently

4  cashed, checks that were written prior to the petition date are

5  not otherwise cashed or honored.

6          The debtors are similarly seeking authority to

7  maintain their ordinary course process for collecting, holding,

8  and disbursing cash throughout their cash management system and

9  to perform under the terms of the cash pooling agreements.

10          Cash management systems similar to that of the

11  debtors, and related agreements like the cash pooling

12  agreements, are also routinely implemented to consolidate and

13  manage cash flows and bank accounts among affiliates within a

14  corporate enterprise.  The debtors believe that continued use

15  of their cash management system as well as their continued

16  performance under the cash pooling agreements is in the best

17  interest of the debtors' estates and parties in interest and

18  should be authorized by the Court.

19          Next, your Honor, the, the, the debtors would request

20  that they not be required to include the legend DIP or other,

21  any other debtor-in-possession designation and the

22  corresponding bankruptcy case number on their business forms.

23  The, the debtors respectfully submit that this release is,

24  relief is appropriate.  The debtors, as non-operating entities,

25  have few business relationships and the parties they conduct

1    business with, such as law firms, are expected to be well aware

2    of the debtors' status as debtors in possession.  As such, the

3    alteration of the debtors' checks and business forms to include

4    debtor-in-possession designation would be unnecessary.

5    Further, your Honor, the, the Court has allowed debtors to use

6    their prepetition business forms and checks without the "DIP"

7    label and corresponding bankruptcy cases [sic] in other large

8    cases, including in this District.

9          Next, your Honor, we're requesting a limited waiver of

10   section 345(b) of the Bankruptcy Code.  The debtors submit that

11   cause exists to justify a waiver of section 345(b) of the

12   Bankruptcy Code, a limited waiver of section 345(b) of the

13   Bankruptcy Code of these cases to the extent that funds

14   maintained in, in their bank accounts or any domestic account

15   opened during the chapter 11 cases exceed the amount insured by

16   the FDIC or FSLIC.  JPMorgan Chase is an extremely stable,

17   reliable institution and the debtors maintain that any other

18   banks will be of similar status.  It will be -- it will impose

19   an undue and unnecessary administrative burden on the debtors

20   to require the debtors to open and maintain numerous accounts

21   with limited funds such that all account funds may be covered

22   by FDIC insurance, or, alternatively, to maintain a bond for

23   the value of the account funds.

24         Your Honor, we did have discussions with Ms. Abel this

25   morning about this particular issue.  One of the concerns that

1    she raised was the amount of funds that the debtors have in, in

2    their particular accounts at present.  We are, are going to

3    continue to discuss with Ms. Abel and come with, come up with

4    a, a, a consensual proposal, have come up with a proposal that

5    we hope will be, we'll reach a consensual resolution of her

6    concerns.

7            In addition, Ms. Abel raised a concern about what we

8    would be doing with our excess cash and what we have

9    represented to Ms. Abel -- and again, we, we owe her some

10   paperwork just so that she is comfortable with what, what we

11   are proposing --  but we are proposing to put the excess cash

12   in funds that are managed by JP, JPMorgan Chase that invest,

13   effectively money market accounts, that invest solely in U. S.

14   Treasury securities.

15           Thus, given all these, given all these components,

16   your Honor, we would, we would request that -- that the -- that

17   -- that we be granted the authority to, to have a limited

18   waiver of section 345(b), once we've come to agreed-upon

19   language with, with Ms. Abel.

20           Lastly, your Honor, the, the, the debtors are seeking

21   authority for banks to charge and the debtors to pay or honor

22   both pre-petition and post-petition services and other fees,

23   costs, and charges, expenses, which, which banks may be

24   entitled to under the terms of and in accordance with their

25   contractual arrangements with the debtors.  The debtors also

1   request that the Court authorize banks to charge back returned

2   items to the bank accounts in the ordinary course of business.

3        The debtors require this relief to minimize disruption

4   to their bank accounts and to assist in accomplishing a smooth

5   transition to operation in chapter 11.  Again, your Honor,

6   authority for, for the debtors to pay these fees and, and for

7   the banks to charge back returned items has been routinely

8   granted in chapter 11 cases as well in this District.

9        Unless your Honor has any, any questions, we would

10  respectfully request that the Court enter an order granting the

11  relief sought by the motion with the proviso that the debtors

12  will work through some language with Ms. Abel with respect to

13  the scope of the section 340, the requested section 345 waiver.

14       THE COURT:  Comments by other parties?

15       MS. ABEL:  Your Honor, this is Shelley Abel.

16       I think that debtors' counsel has covered our

17  discussion pretty adequately, but I just wanted to reserve our

18  right to continue to negotiate on terms of a order before it's

19  submitted to the Court and we will certainly contact Chambers

20  if we need your assistance going forward.

21       THE COURT:  Anyone else?  That got it?

22    (No response)

23       THE COURT:  All right.  I'll, I'll approve all of that

24  with the exception of the open items with the Bankruptcy

25  Administrator.  If you can't come to terms over that, let me

1   know.  We'll set up a, a further telephonic hearing on, on the

2   record to discuss what should be done with that.  I would

3   assume the other parties don't need to be involved in that

4   since no one else has objected.  But hopefully, you'll be able

5   to work your differences out there.

6           The rest of it is fine, okay?  Send me an order when

7   you have one.

8           MR. CODY:  Thank you, your Honor.

9           THE COURT:  Okay.

10          MR. CODY:  Will do.  Thank you, sir.

11          THE COURT:  All right.  Any other base case matters or

12  are we ready to talk about the two motions in the adversary?

13          MR. CODY:  That would conclude the first part of that

14  agenda, your Honor, and we're ready to proceed.  Thank you.

15          THE COURT:  Does anyone need a break before we start

16  in there?  We're about at midafternoon.

17      (No response)

18          THE COURT:  Everyone good to continue?

19      (No response

20          THE COURT:  Okay.  We'll move on, then.

21          Mr. Erens, back to you.  You wanted to, to take the

22  motion and -- we've got two motions.  One's the injunction and

23  the other is the surface, service procedures.  The second may

24  be the least controversial of the two.  Do you, do you have a

25  preference as to which to approach first?

1          MR. ERENS:  Your Honor, we were intending to approach

2     the actual TRO first but, if you'd like, we can just dispense

3     with the service procedures, but I'm not sure there's really

4     any objections.

5          THE COURT:  Let's get that out of the way.  If that --

6     that's likely not to be controversial.  I can tell from the,

7     the pleadings.  The other, of course, is.  Why don't we address

8     No. 7, then, the debtors' motion for approval of service

9     procedures.

10          MR. ERENS:  All right.  Thank you, your Honor.  I'll

11     be happy to do that.

12          The relief is pretty straightforward, your Honor.

13     The, the point, of course, is that claimants are represented by

14     law firms.  We have information as to the names of the law

15     firms.  We often don't have the information as to the names of

16     the claimants.  There's been a practice, historically, in

17     asbestos cases that the law firms would like to receive the

18     pleadings.  They don't necessarily want their clients to

19     receive the pleadings, which is for good reason.  The clients

20     often may not understand the pleadings.  They would turn back

21     to their, their, their, their lawyers, anyway, to understand

22     what the pleadings really mean and, as a result, what we'd like

23     to do is basically get authority to serve the adversary

24     proceedings on the law firms rather than the claimants.  That

25     includes, of course, the summons and complaint, initially, and

1   then, ultimately, the other pleadings in the adversary

2   proceeding, itself.

3          So with respect to the summons and complaint, as we

4   set forth in the motion, there is authority under the Local, or

5   not the Local Rules, but the applicable Rules for the summons

6   and complaint to be served on an agent.  We believe the law

7   firms represent agent under the circumstances and, therefore,

8   service on the law firms is authorized by, by the appropriate

9   Rules.

10          With respect to the other pleadings, there are a

11  number of reasons and I gave some of them, already, to serve

12  the pleadings on law firms rather than claimants, (a) they're

13  represented, already, so we think it might be inappropriate,

14  frankly, for the debtors to serve those pleadings on the

15  claimants.  Again, it's more efficient for the pleadings to go

16  to the law firms, themselves.  Often, we don't actually have

17  the address information for the individual claimants.  And

18  again, the claimants often would turn back to their law firms

19  to understand what the purpose of the pleadings are, in any

20  case.

21          So we don't think there's any controversy between the

22  company and the various law firms as to what the proper

23  procedure should be.  This type of motion has been approved in

24  numerous asbestos cases previously.  It was approved in DBMP.

25  It was approved in Bestwall, Kaiser Gypsum, Garlock.  We think

1   it's appropriate.  We also think it's consistent with the Rules

2   of Professional Conduct and we would ask your Honor to approve

3   the procedures set forth therein.

4          THE COURT:  Any comments, objections?  Anyone else to

5   be heard?

6      (No response)

7          THE COURT:  Okay.  That one is approved.

8          All right.  Backing up to the TRO/preliminary

9   injunction matter.  Mr. Erens?

10         MR. ERENS:  All right.  Thank you, your Honor.

11         Your Honor, I know we're going to have a lot of issues

12  to discuss this afternoon on the proposed TRO, but I wanted to,

13  to start with the, the following, which is, as I indicated in

14  the introduction, there are thousands of pending claims,

15  asbestos claims, currently against the debtors.  There's over a

16  hundred thousand claims, or close to a hundred thousand claims

17  and there's close to 8200 mesothelioma claims.  These are

18  claims in this bankruptcy.  They are pending against the two

19  debtors.  When you cut through all of this -- and I'll go

20  through some detail -- but the ultimate purpose of the

21  adversary proceeding for today, the TRO and, ultimately, a

22  preliminary injunction, is to resolve the claims in the

23  bankruptcy case.  It is to prevent piecemeal litigation of the

24  exact same claims that are being asserted in this bankruptcy

25  case by, or exist in this bankruptcy case by asbestos claimants

1   from being litigated in piecemeal litigation throughout the

2   country.  They are claims against the debtors and if parties

3   are able to then, instead, try to assert the exact same claims

4   against third parties otherwise, we don't have much of a

5   bankruptcy case, your Honor.  The stay is eviscerated.  The

6   purpose of the bankruptcy case to resolve all the claims

7   collectively under 524(g) is, is eviscerated as well.  And so

8   we think that the adversary proceeding is critical to the

9   success of the bankruptcy and is integral to the bankruptcy,

10  itself.

11          So what does the adversary proceeding seek to do?  It

12  seeks to present or -- excuse me -- to prevent various parties

13  from pursuing, again, what we call Aldrich and Murray claims,

14  which are claims against the debtors against third parties.

15  There's three categories of parties.  There are corporate

16  affiliates, there are insurers, and then there are parties that

17  we call indemnified parties.  Those are parties that the

18  debtors have indemnified for asbestos claims or the asbestos

19  claims initiated.  Ultimately, your Honor, the debtors will be

20  seeking both a preliminary injunction and/or a declaration that

21  the automatic stay or section 362 prevents the prosecution of

22  the claims against the debtor against third parties, but for

23  today we're limiting the relief we're seeking, obviously, to

24  the TRO.

25          The request for the relief is supported by two

1  declarations, the declaration of Ray Pittard, the, the

2  companies', or the debtors' Chief Restructuring Officer, and

3  the declaration of Allan Tananbaum, the debtors' Chief Legal

4  Officer.  And we would ask that those two declarations be moved

5  into evidence as a result.

6         THE COURT:  Any opposition, again subject to the right

7  of cross-examination?

8         MR. ERENS:  Correct, your Honor.

9         THE COURT:  Anyone opposed?  Anyone?

10     (No response)

11         THE COURT:  Received.

12     (Declarations of Ray Pittard and Allan Tananbaum admitted

13  in evidence)

14         MR. ERENS:  All right.  Thank you.

15         Again, the purpose of the case, your Honor, is to

16  fully and fairly resolve the asbestos claims against the

17  debtors through the establishment of a 524(g) trust.  We

18  believe the adversary proceeding relief is critical to that

19  purpose.  Absent the relief, claimants could litigate the exact

20  same claims that exist against the debtor, again against

21  various parties throughout the country.  It would prevent all

22  the claims from being dealt with collectively.  In this case,

23  it would eviscerate the stay and, frankly, would require the

24  debtors to go defend that litigation for reasons I'll get into

25  momentarily, which would obviously divert their attention from

1    the reorganization at issue.  It would defeat the purpose of

2    the case and it would defeat the purpose of 524(g).

3           Importantly, this is a fact that we should never lose

4    sight of.  None of the protected parties manufactured or sold

5    an asbestos-containing product that gives rise to a claim

6    against the debtors.  The only protected party that maybe is an

7    exception are the entities that no longer exist, the two

8    entities that ceased to exist as part of the, the divisional

9    mergers.  Those claims are allocated to the debtors in the

10   divisional mergers.

11          So those claims are clearly against the debtors and we

12   say in our pleadings that those claims clearly are stayed.  For

13   today, since we haven't sought a declaration under 362 we

14   include them in the TRO request.  But other than that, none of

15   the parties that are on the protected party list manufactured

16   or sold the asbestos-containing products at issue.  Instead,

17   the debtors became solely responsible for those liabilities as

18   part of the 2020 restructuring, as was mentioned.  And after

19   that restructuring was done in early May, the companies started

20   communicating that fact to plaintiffs' counsel.  It didn't

21   happen overnight, but it started happening relatively soon and

22   in the, I'll call it, roughly 30 days since that communication

23   started in May the debtors have now found almost 70 cases in

24   which the same claims that exist against the debtors are being

25   asserted under various theories, successor liability, alter

1   ego, etc., and -- we said in the papers 65 claims.  We think

2   it's now 70 claims -- and we think it'll just accelerate from

3   here.

4            So the relief we're seeking is not speculative, as

5   maybe someone has tried to point out in one of the papers.

6   There are now 70 of these types of lawsuits out there that name

7   New Trane Technologies as a defendant and New U.S. Trane Inc.

8   as a defendant.  There's some claims against Gardner Denver,

9   Inc.  Again, it was communicated.  These are claims against the

10  debtors, but nonetheless, in the tort system the lawsuits were

11  being brought against third parties.  If that continued, your

12  Honor, again, today we have 70.  I think in the future we could

13  have hundreds, if not thousands, of these individual lawsuits

14  throughout the country.  I'm not sure what this bankruptcy case

15  would really look like at that point.  The claims are claims in

16  this case.  They shouldn't be litigated while the stay is in

17  existence.

18           In terms of the authority, your Honor, for the

19  injunction, pretty straightforward.  Section 105(a) of the

20  Bankruptcy Code gives your Honor the authority to enter the TRO

21  and, ultimately, the preliminary injunction.  This type of

22  injunction has been entered in numerous cases in the asbestos

23  context.  We provide in the papers a laundry list of those

24  cases.  I think it was, maybe, 20.  Most recently, in this

25  jurisdiction the injunction was entered after contest in the

1    <u>Bestwall</u> case by Judge Beyer and I think your Honor is aware in

2    the <u>DBMP</u> case your Honor did enter the, the TRO.  I think

3    there's a schedule on litigation for the preliminary

4    injunction, itself.

5        THE COURT:  Uh-huh (indicating an affirmative

6    response).

7        MR. ERENS:  Matter of fact, your Honor, the debtors

8    are unaware of any case in which this type of injunction has

9    not been entered for all the reasons that make sense because if

10   you don't have this type of injunction, you really don't have a

11   bankruptcy case.

12       In terms of case law authority on how your Honor is to

13   assess the propriety of the injunction, the case law in this

14   Circuit goes back to <u>Robins</u>, <u>A. H. Robins</u>, the mass tort case.

15       THE COURT:  Uh-huh (indicating an affirmative

16   response).

17       MR. ERENS:  The <u>Robins</u> case, in large part, indicates

18   that your Honor has the authority to enter this type of

19   injunction where third-party litigation would put undue

20   pressure on the reorganization or would interfere with the

21   reorganization.  That's the basic standard provided and, in

22   fact, it's never been clear that that, itself, is not

23   sufficient, per se, to enter the injunction.  Nonetheless,

24   courts in this jurisdiction typically go through a four-factor

25   test for these types of injunctions, although I'm not sure your

1    Honor has to do that based on the <u>Robins</u> case.  And there are

2    four factors that apply.

3         The four factors are whether there's a reasonable

4    likelihood of success, of a successful reorganization; the

5    threat of irreparable harm to the debtor; the balance of harms

6    between the parties; and the public interest, whether it

7    supports the injunction.  Your Honor, each of the four prongs

8    for the issuance of the TRO today and, ultimately, an

9    injunction, are satisfied.

10        With respect to reasonable likelihood of success, as

11   we point out in the papers, at the outset of a bankruptcy this

12   test is not designed to be particularly high.  This is not a

13   guarantee, this test is not a guarantee that this will be a

14   successful reorganization, but it is a standard that says there

15   is a reasonable likelihood that it will be a successful

16   reorganization.

17        Your Honor, the facts are uncontroverted that that is

18   the case.  First of all, as mentioned, under the funding

19   agreements the debtors have more than sufficient resources to

20   fund fully a 524(g) trust.  There are adequate resources to do

21   a reorganization here and obviously, as I mentioned at the

22   beginning, our intent is to sit down with the plaintiffs and to

23   effectuate that result.  We have come to this Court to conduct

24   a proceeding that, hopefully, will lead to a successful 524(g).

25   That is our intent.  We have come in good faith and we will

1   work hard to reach that result, the very purpose of the 524(g)

2   statute.

3        In addition, as judicial notice might indicate, many,

4   many cases have been resolved under 524(g).  There have been

5   many reorganizations under 524(g) of the Code and I think in

6   Mr. Maclay's statement he talked a little bit about Garlock as

7   being a tough case.  Garlock was a tough case, but even in that

8   case they reached a resolution.

9        So as a result, debtors do meet the reasonable

10  likelihood of success.  We do believe it's likely that there'll

11  be a 524(g) result at some point in this case.

12       With respect to the second prong, threat of

13  irreparable harm, I mentioned in the introduction some of the

14  points here.  This is a fairly straightforward analysis.  If

15  the same claims that exist in this bankruptcy and that are

16  stayed are, instead, brought throughout the country on various

17  theories against third parties that the debtors have

18  indemnified -- and that's one of the linchpins here.  The

19  debtors have indemnified protected parties -- then that's

20  really a process where the claims will be fixed outside of this

21  bankruptcy against the debtors.  You don't have much of a

22  bankruptcy if, your Honor, a third party is being sued

23  elsewhere.  That party has a contractual indemnity against the

24  debtor.  The claim is fixed outside of the bankruptcy in that

25  jurisdiction and then becomes a claim in the bankruptcy.

1    Instead, 524(g)'s purpose is to deal with all the claims

2    holistically in this bankruptcy, for the claims to be treated

3    equally and fairly, and together.  The claims that we're

4    talking about, again, are the exact same claims that exist

5    against the debtor, not other claims that exist against third

6    parties.

7             So the indemnity relationship, we think, your Honor,

8    is one of the important points to mention.  If the claims are

9    liquidated against third parties, it would really be tantamount

10   to a claim against the debtor because the debtor has indemnity

11   with respect to these parties.

12            There are other reasons that the, the debtors would

13   suffer irreparable harm if litigation continued outside of this

14   bankruptcy.  So in addition to the indemnity relationship, that

15   really means that, that litigation would be fixing claims

16   against the debtors outside of this bankruptcy.  The debtors

17   would be faced with doctrines of *res judicata*, collateral

18   estoppel.  They'd be subject to evidentiary prejudice in these

19   other proceedings.  At the end of the day, since the claims

20   would really be tantamount to claims against the debtors, they

21   would be forced to ultimately go and defend those claims

22   throughout the country.

23            So while they're trying to conduct a bankruptcy, your

24   Honor, in North Carolina, they would be, they would be working

25   throughout the U.S. defending these claims and would not have

1    the resources, we think, to adequately prosecute the bankruptcy

2    at the same time.  They'd have to, they'd have to participate

3    in the litigation and there'd be significant diversion and

4    that's, obviously, contrary to the breathing spell that section

5    362 is designed to create for a debtor in bankruptcy.

6          So that, in large part, would be the irreparable harm

7    the debtors would face.  The claims would not be in this case.

8    They would be litigated outside this case, even though they're

9    tantamount to claims against the debtors.

10          In terms of balance of harms, I just went through the

11   harms to the debtor.  In terms of harms to the claimants, we

12   think, your Honor, the harms are really pretty limited.  First

13   of all, as I mentioned, none of the parties we're talking about

14   manufactured asbestos-containing products at issue in this

15   case.  These are insurers, these are corporate affiliates,

16   these are parties that are indemnified by the debtors, but did

17   not actually manufacture the products.

18          More importantly, your Honor, as is well known,

19   plaintiffs sue multiple parties in the tort system.  So it's

20   not like the debtor is the only defendant on these cases.  The

21   complaints we typically see name scores of defendants and the

22   plaintiffs will be continuing to recover against those

23   defendants in the tort system as well as in the bankruptcy

24   trust system.

25          So the debtors may be one out of 20, 30, 40, 50

1    defendants in a case.  So the prejudice is limited only to the

2    amounts that they cannot currently recover against the debtors.

3         Thirdly, your Honor, the tort system is a fairly

4    inefficient process for reasons I indicated at the beginning of

5    the presentation.  There are many claims that linger in the

6    tort system for years.  It's expensive.  A lot of the money

7    that's spent by the defendants actually do not go to the

8    plaintiffs.  Maybe less than 50 percent of the money that's

9    spent by the defendants go to the actual plaintiffs.  524(g) is

10   a much more efficient, much better system for everybody once

11   the 524(g) result is achieved.

12        So while there may be some delay, ultimately the

13   result that's sought to be achieved here will be much better

14   for the plaintiffs as well.

15        Thirdly, your Honor, as I think I mentioned before,

16   it's, the purpose, or one of the purposes of 524(g) to keep all

17   the claims together, to treat them equally and fairly, and if

18   you have some claimants outside of the system and some

19   claimants inside of the bankruptcy system, that's not

20   necessarily equal treatment.  So there is unfairness not only

21   to the debtors, we believe, from having this collateral

22   litigation go on throughout the country, there can be, there

23   can be damage or harm to claimants as well.

24        There's a allegation in, in one of the pleadings, I

25   think, that was filed this morning that delay is a big harm to

1    the claimants.  We don't discount the delay, your Honor, and

2    that's why we say we want to move this case, but delay is never

3    sufficient, your Honor, to deny an injunction.  An injunction

4    always involves delay.  If delay were sufficient to deny an

5    injunction, your Honor, then injunctions would never be issued.

6           So that's the balance of harms.  We think it clearly

7    favors the debtors to maintain the integrity of the stay and

8    the integrity of the bankruptcy case.

9           Finally, public interest.  As we, as your Honor read

10   in the papers, there's always a public interest in a successful

11   reorganization.  We're going to work hard to get a successful

12   reorganization in this case and we think that's especially true

13   in a situation as complicated as this, which involves thousands

14   of asbestos claimants.  A successful reorganization that can

15   resolve what has been a really difficult problem, as I said

16   over several decades and could continue, potentially, in,

17   outside of this bankruptcy, if it didn't occur for several more

18   decades in the tort system, if we can achieve that result, that

19   is a fantastic result and is very much in the public interest

20   and would allow claimants to be resolved in a full and fair

21   manner and litigation that has really dogged, I think,

22   everybody for a long time will be resolved.

23          So a public interest, I think, your Honor, clearly

24   favors trying to protect the integrity of this bankruptcy and

25   to achieve a successful reorganization.

1    Before I finish, your Honor, I do want to mention a

2    couple things about section 362 of the Bankruptcy Code.  We're

3    not seeking, again, a declaration, although we do ultimately

4    seek a declaration that 362 applies to the protected parties in

5    certain circumstances.  Today, we're just seeking a TRO, but

6    362 itself does support the relief we're seeking in many

7    different ways.

8    So, for instance, as I mentioned before, Old Trane and

9    Old Trane Technologies no longer exist.  So while they are

10   protected parties, the claims that existed against those

11   entities were allocated to the debtors.  So those are now

12   direct claims against the debtors.  So we think 362(a)(1)

13   clearly applies to protected parties, Old Trane and Old Trane

14   Technologies.

15   Secondly, as I mentioned, one of the categories of

16   protected parties are the insurers.  The debtors have

17   substantial insurance, as indicated in the first day papers.

18   Allowing parties to pursue insurance of the debtors and to try

19   to reduce the insurance asset of the debtors clearly is a, we

20   believe, a violation of section 362(a)(3) of the Bankruptcy

21   Code because the insurance, the insurance, your Honor, is an

22   asset of the estate.

23   In addition, many of the types of claims that would be

24   asserted against the protected parties in the tort system would

25   be things like fraudulent conveyance, piercing, successor

1   liability.  Those are all estate causes of action at this

2   point, your Honor.  Those are assets of the debtors.

3          So allowing parties to pursue those types of causes of

4   action in the tort system would be using estate property,

5   again, we believe, in violation of 362(a)(3) of the Bankruptcy

6   Code.

7          And then finally, going back to section 362(a)(1) of

8   the Bankruptcy Code, going back to Robins, which I mentioned at

9   the beginning of this process, the Robins case, again, stands

10  for the proposition that the automatic stay can be extended to

11  a party where there's such an identity of interests between

12  that party, the defendant, and the debtor, that the claim being

13  brought is really being brought against the debtor.  Your

14  Honor, that, again, is what's going on here.  The claims that

15  are, that would be sought to be brought if this injunction or

16  TRO would not be entered would be tantamount to claims against

17  the debtor.  We think that, again, would be eviscerating the

18  automatic stay for purposes of this bankruptcy case and the

19  goal to achieve a section 524(g) result.

20         So going to the TRO specifically, because that's all

21  that's being asked of your Honor today, we're moving under Rule

22  65(b) and Bankruptcy Rule 7065.  As noted, there's already been

23  now, what, 70 cases filed against protected parties.  If the

24  stay or -- excuse me -- if the TRO were not entered, we know

25  that number would only go up.  Given the bankruptcy, we think

1    the process would be accelerated because it'd be sort of common

2    sense for parties to say one of a number of things.  One is, "I

3    haven't brought a lawsuit yet.  Well, I can't bring a lawsuit

4    against the debtor.  They're getting a stay.  So I'm going to

5    bring a lawsuit against one of these protected parties."  Two

6    is, "If I've only got a lawsuit against the debtor, I'm going

7    to amend it now 'cause I can't continue it against the debtor.

8    I'm going to amend it to add the protected parties and just go

9    sue them."  So we'll see more and more of those.  And then,

10   finally, if there are parties who have brought lawsuits and

11   have named these third parties, they will continue to prosecute

12   those lawsuits.  That's the 70 that I mentioned, or so, that

13   already exist today.  And again, that's only in the course of a

14   month.

15           So, in fact, the, the bankruptcy filing would probably

16   precipitate the problem that we've already seen in the tort

17   system prior to the filing of this bankruptcy.  This type of

18   TRO, again, your Honor, has been granted numerous times.  It

19   was granted in Bestwall, ultimately led to the entry by Judge

20   Beyer of a full TRO.  It was entered, your Honor, in DBMP

21   subject to the pending litigation schedule over the PI.  It was

22   entered in Garlock.  It was entered in Kaiser Gypsum.  We think

23   it's fairly routine in these bankruptcy cases to get a TRO to

24   get the case stable and on a full track and if parties want to

25   litigate over the PI over a course of a longer period of time,

 1  that's certainly their right.

 2          In terms of the period of time we're seeking for the

 3  TRO, normally TROs are for 24 -- excuse me -- for 14 days, but

 4  the, the Court can for cause extend it up to 28 days.  We

 5  would, as we indicated in the papers, ask that the Court extend

 6  the TRO for the full 28 days for the main reason that an

 7  asbestos claimants' committee will be appointed soon and we

 8  want to give them the maximum amount of time to sit down with

 9  us and discuss all the issues associated with the TRO and the

10  ultimate preliminary injunction.  I don't know how long it'll

11  take the ACC to get appointed, but 14 days may not be enough

12  for them, to sit down with them and discuss the issues

13  associated with this litigation matter.

14          Thank you, your Honor.

15          THE COURT:  All right.

16          Responses?

17          MS. SIMPSON:  Your Honor --

18          THE COURT:  Ms. Ramsey.

19          MS. SIMPSON:  -- I'll let Ms. --

20          MS. RAMSEY:  Yes, your Honor.  Oh.

21          MS. SIMPSON:  -- Ramsey go first.

22          THE COURT:  Okay.

23          Ms. Ramsey, you want, want honors?

24          MS. RAMSEY:  Thank you, your Honor.  Yes, I would.  I

25  appreciate it.

1          Your Honor, I'm going to ask, with the Court's

2    permission, my colleague, Davis Wright, to put up on the screen

3    some slides that we prepared for today and have ready to

4    distribute to the other parties.

5          THE COURT:  All right.  We'll see how this goes.  I

6    think there was some conversation beforehand with our tech

7    staff as to putting these up.

8          MS. RAMSEY:  Uh-huh (indicating an affirmative

9    response).

10         THE COURT:  All right.  Let's see how we go.

11         MS. RAMSEY:  That's correct, your Honor.  Right.

12         THE COURT:  Very good, excellent.

13         MS. RAMSEY:  Terrific.

14         So, your Honor, I'd like to start by calling back to

15   the hearing on the first day in the DBMP case where your Honor

16   observed:

17             "This is new.  For those of us who have been doing

18             debtor-creditor work for 30-odd years, the idea that

19             you can have a liability go through a merger and not

20             have a liability on one part of your entity is a

21             little bit of a new thought.

22             Also, with regard to the general bankruptcy concept

23             that when you come into bankruptcy you bring all of

24             your assets and subject them to the risk in order for

25             the bankruptcy relief."

1          So, your Honor, with that, the Court indicated that it

2     was going to enter the TRO, but would, was not necessarily

3     inclined and was reserving judgment with respect to entry of a

4     preliminary injunction --

5          THE COURT:  Uh-huh (indicating an affirmative

6     response).

7          MS. RAMSEY:  -- to be a decision that the Court was

8     going to make after a contested evidentiary hearing, which is

9     now scheduled, as the Court knows, for early September.

10          So this is -- I wanted to call back that, signify the

11     Court because we are going to ask the Court today to revisit

12     that determination and we're ask -- ask -- going to ask the

13     Court to, to make the opposite call today.

14          Your Honor, this is the third time, as Mr. Maclay

15     mentioned, that we've seen this same pattern.  We saw it in

16     Georgia-Pacific back in November of 2017, we saw it with

17     CertainTeed in January of 2020, and now we've seen it with the

18     two Trane entities with virtually the identical type of

19     proceeding that the Court has seen before.  These companies

20     traveled to Texas, were there for a very few hours -- in this

21     latest iteration less than two hours -- and then one, the, the

22     entity that had the majority of the assets went back to

23     Delaware or to Delaware and the entities that were the

24     repository of the asbestos liabilities, a funding agreement,

25     and, and very little else, traveled to, to North Carolina and

1    prepared for a bankruptcy.

2         What is a little unique about this particular

3    transaction, your Honor, is that this is the second part of a,

4    a series of transactions.  In March of this year, there was,

5    there were a series of transactions that are known as the

6    Reverse Morris Trust Transaction.  It, it's, essentially, a, a

7    tax-sheltering structure and I don't want to get too deep in

8    the woods, your Honor, but I think it's important to sort of

9    understand how this fits in with the overall picture.

10        In the top left-hand side, you will see that these

11   entities started out as Gardner Denver and what we've called

12   Old Ingersoll Rand.  Following it to the right, then what

13   occurred was that Old Ingersoll Rand spun off Ingersoll Rand

14   Industrial, one of its operating entities.  It then merged Old

15   Indust -- IR Industrial merged with Gardner Denver.  And this

16   is the part that is critical to us, your Honor.  As part of

17   that, 1.9 billion in cash and 6.9 billion in stock traveled out

18   of Gardner Denver and went to Old IR and then, in the last

19   days, your Honor, New IR changed its name -- Gardner Denver

20   changed its name to New Ingersoll Rand and Old Ingersoll Rand

21   became Trane.  The importance to us, your Honor, is that this

22   transaction resulted in almost $7 billion of value traveling

23   out of the entities that are now depending on the two

24   iterations of, that are called New Trane and New TTC to pay

25   these obligations.

1      We then go to, your Honor, what you've seen before,

2    which is the funding agreement allocations between these

3    entities.  We have Trane U.S. and Trane Technologies providing

4    a funding agreement to Aldrich Pump and Murray Boiler and we

5    have a tiny little part of the agreement that provides for an

6    indemnification by those entities back to Trane, which is the

7    same sort of structure we've seen before, and, and it's

8    structured that way, as, as we advised the Court before, to

9    give the debtors an argument that there's some reciprocal duty

10   and they have some skin in the game in this, but ultimately, as

11   they've candidly told the Court, these are backstops.  This

12   funding agreement is a backstop and the obligations from Trane

13   U.S. and Trane Technologies mean that they are the real parties

14   that have a financial interest in this case.

15        What is unique about this case, as, as Mr. Maclay

16   advised the Court and as we put in our brief this morning, is

17   that here we have a funding agreement that seeks to limit the

18   Court's ability to determine whether Trane U.S. and Trane

19   Technologies receive 524(g) relief and they do that by

20   providing that the only kind of plan that can be confirmed is a

21   plan that provides these non-debtor funding parties with all of

22   the, all of the protections of section 524(g) of the Bankruptcy

23   Code.  They also go on to augment those provisions by saying

24   that, that the agreement, the funding agreements terminate on

25   the effective date of a plan and they provide that, you know,

1   this has to be a lump sum.  And you heard some justifications

2   this morning about that.  This is just clarification and that

3   was what, you know, of course, was always meant, but the Court

4   may be aware that the funding agreements are reflected as

5   having been amended on June the 15th -- so last Monday before

6   the filing -- coincidentally after, in the <u>Bestwall</u> case, a

7   plan was proposed.  It did not provide 524(g) relief to the

8   plan funders and provided for an assignment of the funding

9   agreement.

10          So this is not accidental or clarification.  This is

11  an effort to close a loophole in the prior funding agreements.

12          If we go to the implications, your Honor, of, of these

13  changes to the Court, it requires the Court to provide 524(g)

14  relief that we contend is inconsistent with the language of the

15  statute, itself.  We believe that these parties cannot qualify

16  for 524(g) relief.  And so that makes this funding agreement as

17  they are proposed in this bankruptcy completely illusory.

18          The payors are, you know, are going to argue, also, we

19  believe, as a result of the lump sum provision that they have

20  to have an estimation proceeding 'cause they're going to

21  contend to the Court that that's the only way they can figure

22  out what that lump sum should be.  Through these modifications

23  to the funding agreement and through the other provisions that

24  were already in the funding agreement, they are looking to

25  restrict all of the normal rights that creditors have.  They're

1  trying to take away the ability of the creditors to file any

2  plan or to assign these agreements or to otherwise take any

3  action that they do not get to control.  As the Court is aware,

4  there are additional flaws in the funding agreements that we

5  have pointed out time and again.  The funding agreements,

6  again, are not secured or guaranteed.  They do not prohibit

7  transfers of assets.  In fact, they expressly permit transfers

8  of assets.  They do not provide any kind of restrictions on

9  incurrence of debt.  They do not prevent further divisional

10  mergers from taking place.

11         So as you go through these, your Honor, they have --

12  the, the structure of the funding agreement means that, that

13  payors are completely in charge of these bankruptcy cases and

14  it's clear from the new funding agreement as now modified that

15  they are running the case for their own benefit.  That's all

16  they're seeking to do.  These cases are about the nondebtors.

17         So if we can go to the next slide.

18         I, I believe that debtors' counsel argued that under

19  Robins the Court does not have to really identify all or really

20  evaluate all of the four factors for a TRO.  The, the Court

21  can, you know, really, just sort of look at, at the first

22  factor.  That is, we believe, not a correct statement of the

23  law, your Honor.  We have cited in our papers the Winter case

24  in the Supreme Court which specifically requires that each of

25  the four factors be satisfied in order for a TRO to, to issue.

1        As the Court -- just one more -- before we get into

2    the, the merits of that, one more piece of this puzzle, your

3    Honor, is that what we've seen that's also different in this

4    case than the other two cases, in Bestwall and then in DBMP, is

5    that although the debtor is sort of throwing out the potential

6    of, of settlement, it's very clear from the Informational Brief

7    that has been filed in this case that the debtors intend to

8    move for immediate discovery and an immediate estimation.  On

9    Page 36 of their Informational Brief when they're talking about

10   the goals of this case they, they say:

11            "Consistent with their intent to move these chapter 11

12            cases forward from the start, they intend to promptly

13            ask this Court to begin a process to help them

14            determine the aggregate amount of the Debtors' current

15            and future asbestos liability for plan purposes."

16        What that means is that the debtors and their plan

17   funders or the, the funding parties are asking the Court to

18   value the asbestos claims through a proceeding in a bankruptcy

19   case as opposed to a way that those claims are valued in the

20   tort system.  And I'll come back to that as we go through the

21   individual factors, your Honor.

22        The, the first factors -- the four factors are listed

23   here and they were correctly identified by the debtors,

24   likelihood of a successful reorganization, imminent risk of

25   irreparable harm, balancing of the harms, and public interest.

1  And, and debtors' counsel cited to the Robins case about,

2  saying that failure to enjoin is appropriate when it would

3  adversely affect the bankruptcy estate or would detrimentally

4  influence and pressure the debtor through a third party.

5  Neither of those things, your Honor, are present here.

6          The debtors, of course, have, have the burden of

7  meeting the TRO factors that are proposed.  There are,

8  actually, four categories, the way that they were described in

9  the papers, that the debtors seek to extend TRO protection to.

10 The first are the former Trane Technologies Company LLC entity.

11 We've defined that as OLD TTC.  The former Trane U.S. Inc.

12 entity, Old Trane.  Those two entities were the entities that

13 went through the divisional merger and resulted in the two

14 debtors and the two new identified plan funders under the

15 funding or funding -- not plan funders -- the entities that are

16 the obligors, the payors, under the funding agreement.  The

17 third is non-debtor affiliates that are identified on Appendix

18 B and those include Trane Technologies LLC, New Trane, and

19 Trane U.S. Inc., New TTC.  The next are entities that are not

20 affiliates of the debtor, but are also identified on Appendix B

21 as to entities that, that it has asserted Aldrich and Murray

22 have contractual indemnification obligations to and the final

23 party are the insurance entities, also identified on Appendix

24 B.

25          So what claims are they looking, first of all, to

1   enjoin?  That's the first thing that we'd like to call the

2   attention, the Court's attention to.  They define the claims as

3   Aldrich/Murray asbestos claims and that means any asbestos-

4   related claim against either debtor, including all claims

5   related in any way to asbestos or asbestos-containing materials

6   asserted against or that could have been asserted against Old

7   Ingersoll Rand or Old Trane. And they go on to say:

8           "For the avoidance of doubt, Aldrich/Murray Asbestos

9           Claims include all asbestos personal injury claims and

10          other asbestos-related claims allocated to,

11          respectively, Aldrich from Old Ingersoll Rand New

12          Jersey or Murray from Old Trane in the documents

13          implementing the 2020 Corporate Restructuring."

14          These are allocated.  They're allocated on purpose.

15  They're allocated by an entity that is looking to avoid

16  bankruptcy filing, itself.

17          So the first question is, the first criteria, no

18  successful likelihood of, of reorganization is possible here.

19  The debtors contend that they have a likelihood of success

20  because they can afford to pay for it, they say, because of the

21  backstop provided by these funding, funding agreements.

22  However, the conditional nature of the funding agreements in

23  these cases do not permit that funding because the funding

24  agreements in these cases are completely subject to facts

25  evolving exactly as the payors would have them evolve and the

1    claimants agreeing.  Because 524(g) plans at their base, at

2    their root require agreement and consent to whatever it is that

3    the debtors believe that the liability is or that they choose

4    to pay.

5           We also raise this for -- New TTC and New Trane, we

6    believe, are ineligible for 524(g) relief because they have

7    independent direct liability to the, to the asbestos claimants

8    as successors to the Old Ingersoll Rand and Old Trane entities.

9           The debtors have not sought, to our, best of our

10   information, any open dialogue with the claimants or any of

11   their representatives.  They have not come to this Court with

12   any agreement.  They can't demonstrate a likelihood of

13   agreement.  The Court has witnessed what has occurred in the

14   other case that is pending.  It's been pending longer, the

15   Bestwall case.  That case has been pending a little over 2-1/2

16   years and, and the debtor's counsel has recently announced that

17   the parties are very, very far apart and the debtors in that

18   case, the debtor in that case contends that the only way to

19   bring the parties together is through an estimation trial.

20          Here, as I mentioned, the Informational Brief in this

21   case is a declaration of war because what the, the debtors and

22   the payors under the funding agreement want to do is have this

23   Court allow them to conduct discovery and challenge -- and

24   they've laid out some of the challenges they would intend to

25   make -- the claims and to come to some estimation of liability.

1   Because, fundamentally, the only way to value these claims is

2   on an individual basis, which can't be done in this case.

3           So we can see that this is a case that is more about

4   trying to contain and control than to resolve fairly the

5   asbestos claims.

6           Finally, your Honor, apart from New TTC's and New

7   Trane's commitments, such as they are, in the funding

8   agreements no other protected party who is proposed to benefit

9   from the TRO has made any commitment or a representation that

10  such an entity would contribute to any section 524(g) trust

11  that might be created.

12          So because of, of that, your Honor, we don't believe

13  that the debtor has sustained any proof of a likelihood of a

14  successful reorganization and, in fact, we believe that they

15  cannot demonstrate that based on the, the language of the new

16  funding agreements.

17          To move to the second factor, your Honor, no imminent

18  risk of irreparable harm to the debtors, we start with Old TTC

19  and Old Trane.  The Court heard debtors' counsel say that and

20  made a, a point twice of saying none of the proposed protected

21  parties other than Old TTC and Old Trane manufactured or sold

22  any asbestos or asbestos-containing products at issue.  Well,

23  that's true.  Neither did the debtors.  These are the

24  responsible entities, Old TTC and Old Trane, but the question

25  is why do those entities need the protection of this Court and,

1   more than that, based on the inequitable conduct that they have

2   engaged in where they have, they have gone through a

3   transaction that took significant value out of these companies

4   and then engaged in a divisive merger, which is expressly and

5   exclusively designed to treat just the asbestos claimants

6   differently than every other creditor of those entities..

7   Those entities, we believe, have engaged in conduct that, that

8   makes them ineligible for this.

9           There's also, your Honor, no allegation that those

10  entities were not able to pay asbestos claims, present and

11  future, in full.  These are the responsible parties and the

12  only alleged harm relates to what has been structured to be

13  harm.  These are the entities that set this up so that they

14  could then cry that they need this Court's assistance to

15  protect them.

16          Moving to the next set of entities, your Honor, are

17  New TTC and New Trane.  Here, the, again, the debtors allege

18  that these entities are able to pay all the claims in full.

19  They, they make that representation on Page 25 of the

20  Informational Brief.  They go on to say a determination -- I'm

21  sorry -- Page 25 of the motion for, for preliminary injunction

22  -- a determination of liability against these entities,

23  moreover, would satisfy some of the asbestos claims and since

24  they're the real parties who have the financial interest,

25  anyway, it's not logical that those entities would not defend

1   and resolve the claims to the best value that they could.

2   Ultimately, when they pay them, it's a net neutral to the

3   debtors because it's going to reduce the funding obligations,

4   but it's also going to take some of these claims out of the

5   estate.  It simply has no harm, let alone irreparable harm to

6   the debtors.

7           Meanwhile, the other thing that we're seeing, your

8   Honor -- and this is in our brief -- is that on June 5th, not

9   long before this bankruptcy was filed, New TTC announced a

10  dividend to its shareholders payable in September of, of

11  approximately $127 million.  That is not different from what

12  we've seen in the Bestwall-Georgia-Pacific context, which is

13  that there are continuing dividends being paid to shareholders.

14  If those entities were in bankruptcy, that would be something

15  that, that was, was a violation of the absolute priority rule.

16  Equity should not be being paid while creditors sit unpaid.

17          Finally, your Honor, again, the only alleged harms

18  that, that the debtor has made are those that they specifically

19  put in place as part of the structure.  Through the secondment

20  agreement it is New TTC and New Trane that are determining

21  which employees are going to be seconded to these debtor

22  entities.  They could provide any other employees that they

23  wished to be seconded.  It is not necessary that the same

24  people that would necessarily be involved in asbestos

25  litigation, if you believe that, that there are individuals

1   that uniquely would have to be involved in that, there's no

2   reason why those are the same individuals that would need to be

3   assigned to these debtors as part of their restructuring

4   effort.

5          Your Honor, I heard, also, debtors' counsel argue

6   that, that tort litigation was inefficient and, and trusts are

7   better.  They're more efficient for asbestos claimants.  And

8   obviously, we have a couple of responses to that.  Partly, our

9   response is the asbestos claimants have their own view about

10  what is best for them and they'd like to be litigating and

11  pursuing their, liquidation of their claims in the tort system,

12  at least, at least and unless there is an acceptable

13  alternative to them.

14         But the debtors' claims of efficiency are -- are

15  simply -- fall on deaf ears because while they may view this as

16  efficient, there is, in fact, irreparable, imminent harm to the

17  claimants.

18         Moving to the next group, your Honor, new debtor, non-

19  debtor affiliates other than New TTC and, and Trane, the

20  debtors have made no showing at all of, list the harm for the

21  102 other non-debtor affiliates on their list.  This is a

22  standard, the TRO standard that must be met on an individual

23  basis with respect to every single entity that is listed and

24  the debtors have simply not made that.  The debtors have not

25  alleged that most of these non-debtor affiliates have been sued

1   even, other than New TTC and New Trane.  There's no allegation

2   that those entities would contribute to this reorganization

3   case, in any event, and many of the proposed protected parties

4   are foreign entities and there's been no representation that

5   they would consent to jurisdiction before this Court, which we

6   believe would be a fundamental requirement that should be a

7   condition of this Court providing any sort of injunctive

8   relief.

9        Moving to the next slide.

10       Again, the debtors have not alleged any basis to

11   enjoin an action against most of the non-debtor affiliates.

12   They, they simply have failed to make any showing at all.

13       The next group, your Honor, are entities that are not

14   affiliates of the debtors, but are indemnified, they said, or,

15   or as to which Aldrich or Murray otherwise has agreed to be

16   responsible.  But that language is a little misleading, your

17   Honor, because all of these indemnifications were assigned.

18   All of these indemnifications were part of assignments during

19   that divisive merger transaction.  These are not agreements

20   that Aldrich or Murray in their 48 days of existence

21   prebankruptcy have made.  Fifteen of the named entities, your

22   Honor, are listed, but there are another large group of, a

23   potentially large group of unidentified other parties which

24   include affiliates of all of the foregoing under various

25   agreements and their respective officers, directors, partners,

1    stockholders, employees, agents, representatives, and any

2    permitted successors or assigns.  In the new, in the amendment

3    today, your Honor, this morning's amendment to, to Annex B,

4    there's also another group of, of unidentified proposed

5    indemnitees, Ingersoll Rand U.S. HoldCo. and its affiliates,

6    including without limitation.  Gardner Denver, Inc., Gardner

7    Denver Holdings, Inc. and Ingersoll Rand are each a protected

8    party, to the extent named in an asbestos claim.

9         So we have all kinds of, of additional parties, your

10   Honor.  Who knows how many there are out there.  With respect

11   to these indemnification obligations, again, your Honor,

12   they're contrived.  They're all part of a structure that is

13   designed specifically to obtain relief in this case.  In a

14   full-pay case, though, your Honor, indemnity claims are going

15   to replace the claims of the asbestos claimants once

16   liquidated.

17        So there's no risk of irreparable harm.  You're

18   trading one creditor for another and to propose that

19   indemnified parties receive the benefit of an injunction so

20   that the asbestos claimants can't recover puts one set of

21   parties above another and makes absolutely no sense at all.

22   It's, it's an absolute bias against the asbestos claimants.

23        Moving to the insurers, your Honor, there are proposed

24   insurers who have insurance-related agreements or they're like,

25   they're under Aldrich or Murray again, they were assigned.  In

1    a full-pay case, your Honor, there's no reason to protect the

2    insurance assets.  Everyone's going to be paid in full.  So

3    there's no risk of irreparable harm.  The asbestos claimants

4    are really the intended beneficiary of these contracts and they

5    should be permitted to continue to collect from every available

6    resource as long as it's not going to harm this estate and it's

7    not going to harm this estate because there's a backstop for

8    the payors.

9          Recently, in the Imerys bankruptcy case, your Honor --

10   that's the, the talc supplier to Johnson & Johnson --

11         THE COURT:  Right.

12         MS. RAMSEY:  -- and other products -- no temporary

13   injunctive relief was sought or entered to protect the

14   available insurance and litigation continued and has continued

15   over the past 15 months.  As your Honor has heard in Kaiser

16   Gypsum many times the argument bankruptcy is not intended to

17   benefit insurance companies.  And finally, your Honor, stays

18   are frequently lifted in cases to make sure that insurance

19   proceeds are allowed to be pursued during the bankruptcy,

20   provided that it will not depreciate the assets that are

21   available, in any event, to, to the other claimants.

22         Moving to the third standard, balancing of the harms,

23   your Honor, balancing of harms in this situation favors the

24   claimants.  The claimants have immediate economic interests.

25   As Mr. Maclay said, you know, at the beginning, these

1    claimants, the money that they are seeking mean the difference

2    between relative comfort at the end of their life or sometimes

3    foregoing that comfort.  It means the difference between a

4    dying person's peace of mind that they have left behind, you

5    know, security for their family versus the absence of that

6    peace of mind.  It is dismissive and callous to assert that

7    asbestos claimants would suffer only mere delay.  It has real

8    and tragic consequences and, in addition to the emotional and

9    medical consequences it has, in some states claimants will lose

10   rights of compensation upon death.  And so that -- and, and

11   also, to the extent that litigation is not continuing, rights

12   may be lost because a claimant's memory loss or death may

13   impact the ability to pursue claims in the future.

14          While the automatic stay is automatic, non-debtor

15   injunctive relief is discretionary with this Court and the

16   debtor offers no justifications to treat the asbestos claimants

17   differently here than it plans to treat all of the other

18   creditors of New TTC and New Trane.

19          We heard debtors' counsel say what kind of bankruptcy

20   do you have?  How -- how will -- how are you going to have a

21   bankruptcy case if at the same time claims are being eliminated

22   and paid during the course of the case?  But inconsistently at

23   the beginning in the opening argument the Court heard how

24   things are being filed every single day and litigation

25   continues to, to go on every single day and, and it goes on day

1   in and day out, were the phrases that I believe counsel used.

2   It is the case that the current claimants, to the extent that

3   they are valuing, liquidating, being paid in the ordinary

4   course, are likely to be replaced by individuals who are

5   diagnosed and who will then have cognizable claims that they

6   will pursue in this bankruptcy case in litigation, but we would

7   advocate to the Court that it is a much more appropriate and

8   effective way for those claims to be valued in the real world

9   in the tort system, which is the American judicial system, and

10  you heard a lot of things about how, you know, this Court is,

11  is supposed to intervene and fix the way that the justice

12  system works, but we do not believe that that is the purpose of

13  this Court.

14          Your Honor, in a full-pay case there's simply no

15  reason --

16          Moving to the next slide.

17          -- that there is a need to protect limited assets so

18  that they can be fairly allocated because 524(g) at its root

19  was designed, really, in mind of cases where there was a

20  limited fund and claimants should share in that limited fund.

21  The use of 524(g) in a contest in which there is a full-pay

22  case does not require that every single claim be valued exactly

23  the same.  In fact, in every single asbestos trust there is the

24  constitutionally required exit to the tort system, ultimately,

25  so that a claimant can try its claim before a jury, as is its

1    right.  In, in a trust, which is a full-pay, a trust, it is

2    perfectly appropriate for claimants to be valued in ways that

3    would otherwise be more typical of valuation mechanisms in the

4    tort system.

5         So the idea that this is somehow contravening the

6    purposes of 524(g) is just not a correct statement.

7         The protected parties had been out, at this litigation

8    for, for some time and there is no reason to believe that in

9    the next 14 days that any significant change is going to affect

10   them by not granting this TRO.  The debtors are not going to

11   suffer any harm.  To the extent that claims are liquidated and

12   paid, they'll simply move out of this bankruptcy and that will

13   simplify and expedite the bankruptcy case and, in fact, it'll

14   eliminate the reason for this Court to have extensive

15   litigation over whether or not an estimation proceeding is

16   appropriate in this context and how claims are to be resolved.

17        And finally, your Honor, denying injunctive relief

18   will expedite the resolution of this case because it will mean

19   that there are countervailing urgencies and pressures that are

20   on the debtor, not just on the claimants.

21        Your Honor, moving to the final point, no public

22   interest.  There's -- a TRO would normalize an otherwise

23   existential threat to the integrity of this entire system.

24   This is a carefully structured scheme which contravenes

25   everything that Congress established in the Bankruptcy Code to

1    balance the competing interests of debtors and creditors.  This

2    is not a normal reorganization.  We're now seeing it for the

3    third time and, perhaps, it's a little less shocking than it

4    was the first time, but this is not a, a normal bankruptcy.  We

5    believe the Court had it exactly right that, that the idea that

6    a nondebtor can sit outside a bankruptcy case, go about its

7    business, capture one set of creditors in a trap, and hold them

8    there for, indefinitely.  It is, is simply not the way that

9    this process was intended to work.

10           A stay or injunction allows the debtors to receive,

11   the, the protected parties to receive the equivalent of an

12   automatic stay while not having that.  So they are free of

13   disclosure and reporting requirements.  They're outside the

14   Court's supervision.  They can continue to engage in whatever

15   transactions they want, pay their shareholders, pay their

16   officers dividends and bonuses and they are completely exempt

17   from all processes, including the fact that as a result the

18   quarterly fees that are paid as a result of these matters are a

19   fraction of what would be made, paid if the, the real party in

20   interest were to be a debtor in the case.

21           There is a strong public interest in the timely

22   compensation of personal injury claimants and in the principle

23   that all entities should be held accountable for the harms that

24   they cause.  To the extent that the debtors or the payors under

25   the funding agreement have defenses like chrysotile isn't

1   really that injurious and mesothelioma is a naturally occurring

2   disease, if they want to advocate those positions, there's a

3   place for them to do it.  It's in the tort system.  Those

4   issues are litigated every day and that's where they should

5   litigated those issues.

6         The public interest in a successful reorganization

7   applies in every case, but in particular, your Honor, this is

8   not a case about a successful reorganization.  There's nothing

9   to reorganize.  You heard a statement that these entities are

10  mere holding companies.  They really don't have much in the way

11  of cash.  You heard that in connection with the cash

12  management.  This is not a true reorganization.  This is an

13  effort to take advantage of one provision of the Bankruptcy

14  Code which is legitimate for a company to take advantage of if

15  it's otherwise prepared to subject its assets to scrutiny, to

16  the transparency that this process requires, to comply with the

17  requirements of the Code, to otherwise engage as a real party

18  in interest.  It is not intended for reorganizations to be

19  corrupted the way that the debtors and the payors would have

20  it.

21        So, in conclusion, your Honor, the debtors have

22  failed, we believe, to satisfy their burden.  They will --

23  denial will expedite a full evidentiary hearing on the merits

24  of a preliminary injunction.  If the Court were to deny it,

25  there's no question that we're going to get before the Court

1    much more quickly where the debtors are going to try to prove

2    up their entitlement to a preliminary injunction and a

3    committee appointed in the case can contest that.  It will

4    certainly not linger because there's ongoing discovery that the

5    claimants have to initiate in order to get the information to

6    challenge it.  It will move it along.

7         And finally, your Honor, it should not be the

8    claimants' burden to challenge an existing injunction and the

9    truth is that we all know that once something's out there it's

10   harder to remove than it is to put it in place in the first

11   instance.

12        So again, your Honor, we are asking the Court to deny

13   the requested TRO.  We understand that this is unique.  We

14   understand that this is an extraordinary request in the scheme

15   of bankruptcy, but these cases present extraordinary issues.

16        The final thing I, I want to say, your Honor, is there

17   was some discussion about the entry of the preliminary

18   injunction in Bestwall.  It is correct the preliminary

19   injunction was entered November of 2018, I believe, and that

20   preliminary injunction is up on appeal and as the Court knows,

21   we are contesting and going to an evidentiary hearing in the

22   DBMP case.  These cases present unique issues.  This case

23   presents an even more set of unique factors.  Your Honor, we

24   believe this is the case where the debtors and the effort of

25   the parties that are engaging in those unique transactions

1   designed to abuse and misuse the Code should be told that the

2   Court is not going to permit that to continue.

3          Thank you.

4          THE COURT:  All right.  Thank you.

5          I think at this point it probably would behoove all of

6   us to take a ten-minute recess for comfort and then pick up

7   with Ms. Simpson's arguments.

8          Anyone opposed?

9      (No response)

10          THE COURT:  Okay.  Don't turn off your

11   videoconference.  We'll leave it right where it is and we'll be

12   back at 20 till, okay?

13      (Recess from 4:41 p.m., until 4:53 p.m.)

14                          AFTER RECESS

15      (Call to Order of the Court)

16          THE COURT:  Have a seat, everyone.

17          Okay, Ms. Simpson.  Ready to hear from you.

18          MS. SIMPSON:  Thank you, your Honor.  Thank you.

19   Linda Simpson, JD Thompson Law, representing Richard and

20   Calvena Sisk.  Mr. Kazan's also on the phone, or on the video,

21   and he is the personal injury attorney for the Sisks.

22          I know your Honor has had mountains of pages to read

23   today in a short period of time and I just wanted to see if you

24   had had an opportunity to read the objection?

25          THE COURT:  I did.

1          MS. SIMPSON:  Okay.  Thank you.

2          I, I'm not going to repeat what's in that objection or

3    what the other parties have stated, but I just wanted to

4    emphasize a few points.

5          Assets have, assets have been removed from the reach

6    of asbestos claimants.  The Reverse Morris Trust Transaction

7    removed nearly 7 billion of value.  The Texas divisive merger

8    removed the vast majority of what was left in the Ingersoll

9    Rand Enterprise.

10          As -- with respect to the funding agreement and the

11    statements that the debtors' counsel made that the added

12    provisions -- these were not in DBMP or the Bestwall cases --

13    but that those were merely there to describe the process, that

14    argument is disingenuous.  I've never heard of smart people in

15    large firms in big cases adding provisions to agreements that

16    have no substantive effect.  But given that, the plain reading

17    of those provisions, as set out in the Sisk objection, means

18    that the funding agreements do not provide assets to the Sisks

19    or other similarly situated asbestos victims unless the Court

20    gives away its, to the debtors, its authority and

21    responsibility to determine the appropriateness of 524(g)

22    relief as to non-debtor entities and the Court is willing to

23    limit any plan considerations to the one the debtors propose, a

24    lump sum payment plan or a sum certain agreed to by the

25    debtors.

1          Because the Ingersoll Rand Enterprise put only shell

2     entities in bankruptcy, the Sisks and other asbestos claimants

3     have been deprived of their ability to look at the transactions

4     and have a full picture of the assets that should have been

5     available to satisfy their claim.  There's no transparency in

6     this case.  There's no transparency as far as the claimants go

7     or the Court and transparency and disclosure are longstanding

8     hallmarks of the bankruptcy process.

9          There's been a lot of references to the _Garlock_ case

10    and Judge Hodges, to this and that.  I want to go back a little

11    before that and recall a case with Thomas Mitchum (phonetic).

12    It was in 1995 and it dealt with the debtor's lack of

13    disclosure.  In that, Judge Hodges quoted a Steely Dan song and

14    he said, "Your black cards can make you money.  So you hide

15    them when you're able.  In the land of milk and honey, you must

16    put them on the table."  In this case, the Ingersoll Rand

17    Enterprise doled a few cards to the debtors and kept the rest

18    hidden under the table.  If they want to consume the milk and

19    honey that this Court has to offer in the form of a TRO and

20    relief, they must submit the full disclosure and transparency

21    and put their cards on the table.  In this case, the

22    machinations of Ingersoll Rand Enterprise, they're contrary to

23    what Congress intended for the bankruptcy system and for

24    asbestos cases.  Put simply, the actions of the Ingersoll Rand

25    Enterprise abused the bankruptcy process by first hiding their

1   assets and then trying to hide them from their victims.

2            This Court is being asked to grant extraordinary

3   relief in the form of a TRO to protect the Ingersoll Rand

4   Enterprise, while what the Inger, while what that same

5   enterprise has done is to strip all protections from the real

6   victims like Mr. Sisk.

7            So why is this Court being asked to protect those who

8   have already more than adequately protected themselves?  When

9   do we protect those who are actually injured?  Your Honor, the

10  time has come to protect real people, like Mr. Sisk, from the

11  overreach and abuse of these companies.  On behalf of the

12  Sisks, I would ask the Court to deny the TRO.

13           THE COURT:  All right.

14           MS. SIMPSON:  Thank you, your Honor.

15           THE COURT:  Anyone else who has not had an opportunity

16  to speak once at least with regard to the current motion?

17      (No response)

18           THE COURT:  Anyone?

19      (No response)

20           THE COURT:  All right.  Any rebuttal?

21           MR. NEIER:  Your Honor --

22           THE COURT:  Yes.

23           MR. NEIER:  Your, your Honor, are we going to take

24  examination of witnesses at some point?

25           THE COURT:  Well, that's the question.  I've, I've

1 | heard discussion, but I haven't heard anyone asking about

2 | witnesses.

3 | MR. NEIER:  Your Honor, I'd like an opportunity to

4 | examine both witnesses on behalf of the asbestos claimants.

5 | It's David Neier for the asbestos claimants.

6 | THE COURT:  All right.

7 | The only thing, folks, it's now 5:00 and we're obliged

8 | to be out of this building by 6:00.  So we're going to have to

9 | do what we can today and we may not finish.

10 | So don't mean to hamstring you, Mr. Neier, but those

11 | are the practical realities of what we're doing, so.

12 | Did anyone else have anything by way of argument that

13 | did not involve examination?  I'm just asking now.

14 | (No response)

15 | MR. NEIER:  And, your Honor, I would expect my, my

16 | witnesses to take, you know, five, ten minutes, each --

17 | THE COURT:  Okay.

18 | MR. NEIER:  -- at most.

19 | THE COURT:  All right.  Mr. Neier, who did you want to

20 | ask?

21 | MR. NEIER:  First, I'd like to call Mr. Pittard.

22 | THE COURT:  Okay.

23 | Is Mr. Pittard on the line?

24 | MR. PITTARD:  Yes, I'm here, sir.

25 | THE COURT:  All right.  Mr. Pittard, if you'll raise

1   your right hand, since we are not physically present.

2            RAY PITTARD, CLAIMANTS' WITNESS, ADMINISTERED OATH

3                          CROSS EXAMINATION

4   BY MR. NEIER:

5   Q   Good afternoon, Mr. Pittard.  My name is David Neier.

6       Do you have a copy of your declaration handy?

7   A   I can get it.  I have, I have an electronic copy I can pull

8   up.

9   Q   Okay.

10  A   Give me one moment here.

11      Okay.

12  Q   Okay, great.

13      Now, Mr. Pittard, you've been a Vice President of the

14  debtors since the, the corporate transaction on May 1, 2020, is

15  that correct?

16  A   Yes, that's correct.

17  Q   And you've worked for Trane, Ingersoll Rand, various

18  affiliates since 1988, for over 30 years, is that correct?

19  A   Yes, that's correct.

20  Q   And with respect to the May 1 transaction, could you turn

21  to Annex 1 of your affidavit?

22  A   Annex --

23  Q   That's the -- that's the -- that's the chart.

24  A   That's the chart.  Okay.  Give me a moment.

25  Q   Okay.  I think it may be on Page 22 of 61 of the PDF.

1   A   Okay.

2       I have it.  Okay.

3   Q   So, Mr. Pittard, as part of the transaction you see the

4   gray box that's labeled Aldrich Pump LLC and that's the debtor

5   in this case, Aldrich Pump, is that correct?

6   A   That's correct.

7   Q   And that's why it's gray, is that right?

8   A   Yes.  'Cause it highlights it at the bottom.  It says it's

9   the debtor.

10  Q   And that entity has the asbestos-related claims that were

11  formerly part of the, the prior entities, is that correct?

12  A   That has part of it.  I think Murray Boiler, also.  There

13  is Aldrich Pump, which is Ingersoll Rand New Jersey, Old IR,

14  and Old Trane is Murray Boiler, the other gray box.

15  Q   We're going to get to that in a minute.

16  A   Okay.

17  Q   With respect to all the other liabilities of those

18  entities, they -- the -- those liabilities are now in the white

19  box that's directly to the right of the gray box Aldrich Pump,

20  is that right, Trane Technologies Company LLC

21  A   That's, that's correct.  That's correct.

22  Q   And, and now let's go to the, the other transaction that

23  you were referring to, which also took place on, on May 1.

24      With respect to Murray Boiler, that's the other gray box on

25  this chart, is that right?

1   A    Yes, that's correct.

2   Q    And that's the, that's the other debtor in this case, is

3   that right?

4   A    That's, that's correct.

5   Q    And once again, Murray Boiler has all of the asbestos

6   liabilities that existed for all of the other entities other

7   than the ones we just talked about with respect to Aldrich

8   Pump, is that correct?

9   A    Yes, that's correct.

10  Q    And the, the remaining liabilities, that is, the

11  liabilities to other creditors other than asbestos liabilities,

12  those are in the white box that is at the other end of that

13  arrow leading into the gray box, that is, Trane U.S. Inc..  Do

14  you see that?

15  A    Yes, I believe so.  That's correct, I believe.

16  Q    And would you agree with the statement made by Mr. Erens

17  earlier that you made the, or the, the entities made the

18  determination that chapter 11 would be a better option than the

19  tort system in these cases?

20  A    The, the board of directors made a decision after

21  deliberation to select chapter 11, as, as explained.

22  Q    And when you say "the board of directors," which board of

23  directors?

24  A    The Aldrich Pump board of directors in that case and the

25  Murray Boiler board of directors.

PITTARD - CROSS                                                    118

1   Q    And who made the determination to enter into the divisional

2   transaction, the divisional merger, on May 1, 2020?

3   A    Those were recommendations that were presented by outside

4   counsel and internal counsel and that was decided through the,

5   the Trane Technologies Company.

6   Q    Okay.  So the, the Trane Technologies Company made the

7   determination to enter into the transaction?

8   A    Yes.

9   Q    And they made, they made the determination to go into the

10  transaction so that these entities could file chapter 11, is

11  that correct?

12  A    No, that's not correct.  They made the decision to seek

13  more flexibility in how we address the asbestos liability, as

14  explained by Mr. Erens.

15  Q    So you're saying that these companies went into the

16  divisional merger and filed bankruptcy within 30 days, 31 days,

17  something like that, but there was no intent on the part of the

18  companies at the time that the divisional merger was entered

19  into to file a bankruptcy case and to seek TRO and a

20  preliminary injunction?

21  A    No.  During that time there was deliberation by the boards

22  repeatedly on the options and alternatives and those boards

23  made independent decisions to, to proceed with the chapter 11,

24  but alternatives were looked at.

25  Q    Okay.  How about with respect to other liabilities of these

companies? Did they make any determinations with respect to those liabilities, that they would retain those liabilities?

A I'm not sure what liabilities you refer to.

Q The non-asbestos liabilities. They retained those liabilities, correct?

A I think the liabilities that Aldrich and Murray have are, primarily, related to, to asbestos, if I understand? I'm not sure I follow your question, I guess.

Q Yeah. I'll try and make it a little clearer.

Can you go to Paragraph 14 of your affidavit?

A Paragraph 14. Give me a moment.

Q And first we'll do the Aldrich Restructuring.

A Sure.

Okay. Paragraph 14.

Q So I would direct your attention to Paragraph 14(c).

A Correct.

Q It says, "Aldrich was allocated certain of the Old IRNJ's assets" --

What does that stand for, by the way?

A That's Ingersoll Rand New Jersey, Old Ingersoll Rand.

Q Uh-huh (indicating an affirmative response).

-- "as set forth below, and became solely responsible for certain of its liabilities, including the asbestos claims against Old IRNJ and the defense of those claims," you see that?

1   A    That is correct.

2   Q    And then go to the next paragraph, Paragraph (d) below

3   that.

4   A    Correct, okay.

5   Q    And it says, "New Trane Technologies was allocated all

6   other assets of Old IRNJ and became solely responsible for all

7   other liabilities of Old IRNJ," is that correct?

8   A    That's correct.  That's correct.

9   Q    And is that your understanding of the transaction?

10   A    That's my understanding of the transaction.

11   Q    And you're saying that at the time that you went into this

12   divisional merger there was no intent to file a subsequent

13   bankruptcy on behalf of the new entity, Aldrich Pump, is that

14   correct?

15   A    What I'm saying was we were seeking flexibility and we

16   wanted to set this up to give ourselves options to look at the

17   best way to resolve it.

18        So the boards met and looked at those options and the

19   option that was chosen at the end was the chapter 11 filing.

20   So that's, that's all I know.

21   Q    So it was on the table?

22   A    At the time there was, flexibility was on the table, but

23   there was no options predefined.

24   Q    Can we agree that with respect to Murray Restructuring it's

25   the same setup, Paragraph (c) and (d), also in Paragraph 14 of

1  your declaration --

2  A   Yes.

3  Q   -- that Murray became solely responsible for the asbestos

4  liabilities and New Trane was allocated all the other assets

5  and liabilities, is that correct?

6  A   That's correct.

7  Q   All right.  Thank you.

8           MR. NEIER:  I have no further questions, your Honor.

9           THE WITNESS:  Okay.

10          THE COURT:  Any other questions of this witness?  Any

11  party?

12     (No response)

13          THE COURT:  Any redirect?

14     (No response)

15          THE COURT:  All right.  Thank you.

16          MR. TORBERG:  No, your Honor.  This is David Torberg.

17  No redirect.  Thank you.

18          THE COURT:  Thank you.

19          MR. NEIER:  Your Honor, hopefully, we can get through

20  Mr. Tananbaum just as quickly.

21          THE COURT:  Okay.

22          Mr. Neier, go ahead.

23          Mr. Tananbaum, let me get you sworn, first.  If you'll

24  raise your right hand.

25     ALLAN TANANBAUM, CLAIMANTS' WITNESS, ADMINISTERED OATH

1          THE COURT:  All right, very good.

2          Please proceed.

3                          CROSS-EXAMINATION

4   BY MR. NEIER:

5   Q   Good afternoon, Mr. Tananbaum.

6          MR. NEIER:  Oops, okay.  We lost him.

7          THE WITNESS:  A little too much --

8   BY MR. NEIER:

9   Q   Lean back.

10  A   A little bit too much sun.  Apologies.

11  Q   No problem.

12     I would ask, also, do you also have your declaration handy?

13  A   I do.  I printed out a clean copy and I have it in my

14  hands.

15  Q   Okay.  That's good.

16     Mr. Tananbaum, you're the Chief Legal Officer of the

17  debtors since the May 1, 2020 transaction that created them, is

18  that correct?

19  A   That's correct.

20  Q   And you, you like -- I'm sorry.  You okay?

21  A   Yeah.  Just controlling the sun.  Sorry.

22  Q   Okay.  And you still work for the, the Trane entities, the

23  non-debtor Trane entities, is that correct?

24  A   That's correct.

25  Q   You and, and Mr. Pittard are both seconded to the debtors

1  for the, the length of these cases, is that correct?

2  A    That's correct.

3  Q    And you've worked for Trane Technologies for 15 years,

4  since January of 2005, is that correct?

5  A    That's correct.

6  Q    And as the Chief Legal Officer you're responsible for the

7  defense and the resolution of all the asbestos-related claims

8  against the debtors, is that correct?

9  A    Yes, that's correct.

10  Q    And would you agree that -- I don't want to repeat what

11  just happened with Mr. Pittard because I think it's pretty

12  clear now -- that all of the asbestos-related claims have been

13  allocated to the debtors and all the other liabilities, non-

14  asbestos liabilities have been retained by the other Trane and,

15  Trane entities, is that correct?

16  A    That, that's correct, along with the asbestos-related

17  assets which went to Aldrich and Murray with the liabilities.

18  Q    Uh-huh (indicating an affirmative response).  But the other

19  liabilities went with the non, or were retained by the

20  nondebtors.  Only the asbestos-related entities, only the

21  asbestos-related claims were assigned to the debtors, is that

22  correct?

23  A    That's correct.

24  Q    Okay.

25          MR. NEIER:  I may be done, your Honor.  Just give me

1    one second.

2              THE COURT:  Take a moment.

3         (Pause)

4    BY MR. NEIER:

5    Q    Did you have any role in the, in the, the corporate

6    restructuring transaction?

7    A    Not as such.  I'm not a corporate transactional lawyer and

8    the, the restructuring was accomplished via internal and

9    external corporate M&A attorneys.

10   Q    Okay.  And who were those corporate M&A attorneys?

11   A    Well, you've got the Jones Day team that has, has

12   identified itself at the hearing and, and as well as some

13   internal staff as well.

14   Q    And did they represent the, the non-debtor Trane-Ingersoll

15   Rand entities at the time of the corporate transaction, the

16   divisional merger?

17   A    Yeah, that's accurate.

18   Q    Okay.

19             MR. NEIER:  Your Honor, I have no further questions.

20             THE COURT:  Other parties of this witness?

21             MR. TORBERG:  Nothing for the debtor, your Honor.

22             THE COURT:  Anyone?

23        (No response)

24             THE COURT:  All right

25             Thank you.  If you were standing, you can step down,.

1    but we're --

2              Any other evidence?

3              THE WITNESS:  Thank you, your Honor.

4              THE COURT:  Any other witnesses to be called,

5    Mr. Neier?

6              MR. NEIER:  Not by, not by me, your Honor.

7              THE COURT:  Anyone else wishing to present evidence?

8         (No response)

9              THE COURT:  Okay.

10             All right.  Any -- and I think I've already previously

11   called for anyone else who wanted to make arguments in

12   opposition to the motion.

13             So I guess it goes back to the debtor at this point

14   for, for rebuttal, if, if desired.

15             Mr. Erens?

16             MR. ERENS:  Yes, your Honor.  Yes, we would like to do

17   rebuttal.  Your Honor, I'll try to keep it relatively brief,

18   given the hour 'cause I know you do have some time limitations.

19             We heard a tremendous amount of material from

20   Ms. Ramsey.  The reality is we've all heard it before.  We've

21   heard all of those arguments in the Bestwall case.  They were

22   all rejected by Judge Beyer.  Now the matter is on appeal, but

23   we do have a decision in the Bestwall case that addresses all

24   of those issues and they were all rejected for all the same

25   reasons that I indicated at the beginning, your Honor, that you

1  should enter the TRO.  If we're going to have a legitimate

2  bankruptcy, your Honor, the claims have to be in this case.

3  They can't be litigated throughout numerous courts across the

4  country.  That would eviscerate the stay and the purpose of the

5  bankruptcy case.

6         But I do want to address a couple of specific items

7  that came up in, I think, most of Ms. Ramsey's presentation,

8  but also maybe a couple others.  So one was the reference to

9  the RMT Transaction.  The facts of the RMT Transaction are

10  somewhat complicated, but the most important point is, your

11  Honor, that transaction was announced in early 2019.  It has

12  nothing to do with the divisional merger and the ultimate

13  filing of these bankruptcy cases.  That transaction was in the

14  works year, well, more than a year before and as we even heard,

15  it deposited $1.9 billion of cash into the Trane Technologies

16  family.  So that have that cash.  That cash is available to try

17  to cut a deal.  As we've said from the beginning, our goal in

18  this case is to reach a resolution with the plaintiffs.  We are

19  here to negotiate.  They seem to be here to fight and to

20  object, but we are here to negotiate to reach a resolution that

21  will be good for everyone.  We think that is exactly what

22  524(g) entails.

23         Secondly, there was continued discussion about the

24  funding agreement.  I, I addressed that at the beginning of the

25  presentation.  I want to address it, again.  There's this

1    allegation that's completely untrue that language in the

2    funding agreement gives the nondebtors the ability to control

3    the case, that, for instance, only a plan that they like can be

4    confirmed in this case.  That is not the case at all, your

5    Honor.  Matter of fact, in the Owens Illinois case, which is

6    not in your jurisdiction but is in Delaware, I do believe the

7    equivalent agreement to a funding agreement, similar type of

8    case, is this does say that the only case that would be funded

9    would be one that's acceptable to the non-debtor entities.

10   That's not the case, your Honor.

11            Again, the provision that keeps coming up is very

12   simple, which is if there is going to be a deal between the

13   debtors, the payors under the funding agreement, and the

14   plaintiffs, it's going to be a consensual deal.  It's going to

15   be a 524(g) deal and the clarification in the agreement is if

16   the nondebtors are going to pay through the funding agreement,

17   they should be released as part of the plan.  Apparently, the

18   plaintiffs are contemplating some scenario which seems

19   fantastic to at least me, your Honor, that we would spend all

20   this time negotiating a deal, the funders would pay money into

21   a trust, and then the plaintiffs could then, later then pursue

22   them, again.  That would not be a deal.  Of course, the

23   nondebtors would not have a reason to deal.  And if the

24   plaintiffs didn't agree to the amounts that the funders were

25   planning on putting into the trust, they wouldn't vote for the

1   plan.  So there wouldn't be a deal, either.

2           So the scenarios that are being raised by Ms. Ramsey

3   and the like are not scenarios that ever are going to exist.

4   Our goal is to get a deal and that deal, like all other cases,

5   will involve, to the extent the numbers justify, payments under

6   the funding agreement and it would be appropriate at that time

7   for the nondebtors to get a 524(g) release for that

8   contribution.  I think somebody once in this hearing said that

9   there was a recent plan where there was no 524(g) release for

10  nondebtors.  They also said there was no funding.  Well, of

11  course, if there's no funding, then there's no need for a

12  524(g) injunction for the nondebtors.

13          But if the nondebtors are going to fund the plan, of

14  course, they're entitled to a 524(g) release and that's common,

15  commonplace in 524(g) reorganizations.

16          Now your Honor will have some time at some point to

17  look at the funding agreement, yourself, and, of course, if

18  your Honor believes that there's a problem with the funding

19  agreement, we would address it.  But the, the hysteria that's

20  being thrown out with respect to the funding agreement is way

21  overdone.  There's no intent to change the purpose of the

22  funding agreement from the prior cases.

23          So as another example, if your Honor ruled through

24  estimation or otherwise that the amount that needed to be

25  funded in a plan in this case was "X," okay --

1        THE COURT:  Uh-huh (indicating an affirmative

2   response).

3        MR. ERENS:  -- and that went through all of the, the

4   litigation that's necessary for that, the funding agreement

5   provides that the funding has to be there for that, for that

6   liability.  So it's not that, you know, the number has to be

7   acceptable to the nondebtors.  That's just simply not the case

8   at all.

9        But again, your Honor, if, if you found in the funding

10  agreement provisions that you found to be unclear or

11  unacceptable, we, of course, would deal with that with your

12  Honor and the plaintiffs, but that's simply not the case in the

13  current funding agreements.

14       Another thing that Ms. Ramsey, I think, said was that

15  there was some implicit threat in our Information Brief that we

16  were going to seek estimation in this case, promptly.  Well, we

17  are going to try to seek estimation in this case promptly or

18  some liability determination because what's happened in the

19  other cases is the plaintiffs keep complaining that the cases

20  aren't moving.  We don't want to be accused of not moving this

21  case.  Now if we sit down with the plaintiffs and there's a

22  deal to be discussed and they would prefer that we put off

23  estimation or some type of liability determination, of course,

24  we would have that discussion.  But the most important part is

25  we do not want to be accused of not moving this case and,

1    matter of fact, in the <u>Bestwall</u> case there's a motion pending

2    by the ACC that seeks to dismiss the case for failure to

3    prosecute the case.  Well, we never want to be accused of not

4    promptly prosecuting this case and that's why we want to move

5    this case for the benefit of all parties, including the

6    plaintiffs.  The plaintiffs are not benefitting by the case

7    lingering in chapter 11.  That's why we want to move the case

8    as promptly as possible.

9         Couple of other things that came up, your Honor, with

10   respect to insurance.  There was a variety of statements.  I'm

11   not sure I understood all of them.  But as I said, your Honor,

12   insurance is an asset of this estate.  Seeking to gain access

13   to the debtors' insurance for the reasons that are set forth in

14   our motion is clearly a violation of the automatic stay.  It's

15   an attempt to obtain control of property of the estate and,

16   therefore, is enjoined under section 362(a)(3) of the

17   Bankruptcy Code.

18        So we, we see no basis not to provide the insurance

19   parties with protected party status or ultimately find that the

20   plaintiffs should not be able to access the debtors' assets

21   through the insurance because that will reduce the assets

22   available for the reorganization.

23        There were some statements made about delay with

24   respect to the four factors, that, that delay by claimants

25   causes harm to them.  Of course, it causes some harm to them.

1   We are not unsympathetic to the plaintiffs in this case, far

2   from it.  But again, your Honor, it's important to understand

3   that these plaintiffs do sue numerous parties.  They are

4   collecting from numerous parties, from other tort defendants,

5   and from trusts.

6        So while, again, we'd like to move the case and get

7   them compensated as soon as possible, it is just simply not the

8   case that, for instance as being alleged, that they're getting

9   no compensation because this case will be pending.  That's

10  simply not the case.

11       I think, your Honor, in closing, 'cause, again, I

12  didn't want to make too long of an argument, Ms. Ramsey

13  admitted this at the very end.  I think this is very telling.

14  She said, you know, we understand we're asking for

15  extraordinary relief to deny the TRO because it's never been

16  denied in other cases.  Because as we indicate in our

17  pleadings, every single case where it's been asked in an

18  asbestos context, the PI has been approved.  Every single case

19  where the TRO has been requested, it has been approved.  I know

20  it's still pending in the DBM case, DBMP case.

21       So what is being asked by the plaintiffs in this case,

22  or the objectors, is really extraordinary relief, which is to

23  allow a bankruptcy to exist and, notwithstanding, all the

24  claims in the bankruptcy are going to start being litigated

25  throughout various courts in the federal and court, federal and

1   state court system throughout the country.  That is not a

2   typical bankruptcy case.  That is in violation of <u>Robins</u>.

3   <u>Robins</u> makes the point from Fourth Circuit law, going back to

4   the 1980s, that when third-party litigation puts undue pressure

5   on the debtor, which is what Ms. Ramsey's intent would be, or

6   it interferes with the reorganization effort it should be

7   enjoined, whether it's just simply should be enjoined or it

8   should be enjoined based on the four factors that we laid out

9   in our pleadings and discussed previously.

10          With that, your Honor, if you have any specific

11   questions 'cause I know a lot came up in the presentations,

12   especially --

13          THE COURT:  Uh-huh (indicating an affirmative

14   response).

15          MR. ERENS:  -- in Ms. Ramsey's, we'd be happy to

16   answer any specific questions.

17          THE COURT:  All right.  Thank you, for now.

18          Anyone else?

19          Ms. Ramsey?

20          MS. RAMSEY:  Your Honor, could I have a very brief

21   opportunity to respond?

22          THE COURT:  Go ahead.

23          MS. RAMSEY:  I'm only going to make two short points,

24   your Honor.  The first is there was an interesting, I think,

25   slip of, of the tongue here with respect to no plan funder

1    would -- would -- nobody -- no funder would dedicate assets if

2    they weren't going to get relief.  But that's inconsistent with

3    what we keep hearing from the debtors, which is the funding

4    agreements are assets of the debtors, that, that give them

5    unfettered access to be able to pay.  And now what we're

6    hearing is, "Well, no, it's not really an asset of the debtor.

7    It's a contribution of a kind by, by a third party, a

8    nondebtor."

9         So this -- this -- this effort to sort of weave in

10   some sort of allegation that, that it's really not an asset of

11   the debtor unless we say it is because we really are trying to

12   buy relief and, and I think that's the -- it's, it's a pay-to-

13   play kind of structure that your Honor should not, should not

14   endorse.

15        The, the other point, your Honor, is, is I, I don't

16   believe that there's hysteria around the funding agreement.  I

17   think, I think the point is that the funding agreement this

18   time changed.  There's never been a reorganization like this.

19   None of them have been successful yet.  There have been no

20   deals.  There have been, you know, there's been one decision

21   and we challenged that and, as I said, it, it is on appeal.

22        But, your Honor, these reorganizations continue to

23   come.  These structures continue to come.  We believe that this

24   is a different enough structure this time by reason of the

25   changes to the funding agreement to justify this Court entering

1   a different type of decision than was previously entered on the

2   TRO in DBMP.  And, your Honor, I do not believe there was a

3   effort to contest the, the entry of the TRO in, in Bestwall,

4   but simply the preliminary injunction.

5           Thank you, your Honor.

6           THE COURT:  Anyone else?

7       (No response)

8           THE COURT:  Well, I wish I had had the benefit of

9   having all those thoughts over the weekend, but I did not and I

10  was in court this morning.  So while I read the responses that

11  were filed by the objecting parties, I did so hurriedly and

12  there's quite a bit to digest here.  It would be sufficient to

13  say that, from what I did in DBMP, that, and as alluded to, I

14  have some concerns about these transactions.  The combination

15  of the divisional merger, the trip to North Carolina.  I

16  understand Ingersoll Rand.  I went to Davidson.  I know where

17  it is.  The, but the bottom line is from Delaware corporation

18  to Texas corporation to debtors filing as North Carolina

19  corporations here and, and the advent of, of this, and I

20  understand how this all came up.  I'm concerned about the

21  transactions and the propriety of what we're doing and to that

22  end, I, in DBMP I did what I'm going to do now, which is to say

23  I feel the obligation to grant the, the TRO, but with a full

24  understanding that the preliminary injunction's going to

25  require a good bit more.

1      Now the COVID virus and the shutdowns and all that

2  affected our time in DBMP.  So we haven't had those hearings

3  yet and we've been forced to enter the preliminary injunction

4  with a savings clause.  I hope we don't have those kinds of

5  delays now.

6      The bottom line is I question whether this is what

7  Congress intended when they created 524(g).  It's not a

8  Manville situation and generally, when enterprise integrity is

9  threatened by claims and assets are limited it appears to me

10 that Congress envisioned that 524(g) would be a vehicle where

11 the corporation could come in, subject its assets and

12 transactions to, to scrutiny, and then with the cooperation of

13 the asbestos creditors come up with a, a trust and a plan under

14 that vehicle.

15      This is something less than that.  I understand why

16 the entities, Trane, Ingersoll Rand, would feel that it would

17 be a unnecessary burden to, to bring the entire enterprise into

18 a bankruptcy context for getting this relief.  I question

19 whether this can be obtained in the absence of, of that

20 excursion or whether or not it is appropriate under the

21 circumstances absent the support of the creditor body.

22      At the same time because we are on the first day of

23 the case and we need some time for all to react and to get a,

24 the creditors' committee, the asbestos creditors' committee

25 formed, I feel obliged to enter the TRO on the same terms as

1   before, before the 14-day provision.  As noted, bankruptcy

2   courts generally do so in these circumstances, but these

3   circumstances are different than what has been attempted before

4   and as I had understood it, most of the fighting in Bestwall at

5   the outset of the case, at least, was over whether or not the

6   case was subject to dismissal under the Carolin standards, not

7   with less attention focused on the, the TRO.

8         You're going to be lucky if you can get me to be

9   consistent with myself, much less with Judge Beyer.  So you're

10  going to have to forgive me.  I have not been sitting in the

11  room listening to all those arguments.  So I'm going to have to

12  take my cases as, as they come up and judicial independence

13  means that I may or may not agree with what was done there.

14        So the bottom line is I'm going to grant the TRO as

15  requested.  I think I need to do it, the way I read the Rule is

16  that I have to do it for 14 days, renew for 14 more if there's

17  cause, and then, beyond that, we have to start talking about a

18  preliminary injunction.  I question whether we can get a

19  committee formed in that time period and, frankly, given my

20  other two cases with Kaiser on for confirmation in July and

21  DBMP up for some hearings as well, of whether we're going to be

22  able to get a full-blown preliminary injunction hearing held in

23  the time periods we're talking about.

24        But for now, I think the best thing I can do is put

25  the TRO in place with full reservations of rights and

```
 1    arguments.  Don't take, take this as going to be written in
 2    stone forever because I have grave concerns about what's being
 3    proposed here.
 4             We will -- I can get you back in court at least on a
 5    TRO basis for an extension.  Looks like -- we are here on the
 6    22nd -- I can have a hearing on July the 1st, if you all are
 7    not looking for exact compliance or if we tie the order from,
 8    from when it's entered, which would probably be tomorrow,
 9    anyway, I could also do this, I think, on July the 6th.  I have
10    July the 8th and 9th available as well.
11             So I'm open for suggestions at this point.  If
12    there's --
13             MR. MACLAY:  The 1st and the 6th both work for me,
14    your Honor.
15             THE COURT:  Okay.
16             Anyone got problems on either of those days?
17             MR. ERENS:  Your Honor, from the debtors' perspective,
18    the 6th would probably be a better date.
19             THE COURT:  Uh-huh (indicating an affirmative
20    response).
21             MR. ERENS:  Again, the reason we were asking for the
22    28 days was to give the committee time.  I'm like you.  I don't
23    know exactly, you know, how long it's going to take them to be
24    formed, but giving a little bit more time would be beneficial.
25             THE COURT:  Ms. Abel, perhaps you would have an
```

1    opinion on this.  You've already started soliciting the

2    committee, correct?

3              MS. ABEL:  Yes, your Honor.  I just wanted to fill in

4    the gaps on that front.  We have requested that responses be

5    provided to my office this Friday, which would be the 26th of

6    June.

7              THE COURT:  Right.

8              MS. ABEL:  And it's my intention to put a motion on

9    for your Court's, your consideration by Monday or Tuesday of

10   the following week, which would mean that the motion could be

11   filed on the 29th or the 30th, and depending on how much notice

12   you think would be appropriate under the circumstances, my

13   office is available for any of the dates proposed.

14             THE COURT:  Okay.  Well, let's, let's use the 6th.

15   That's a Monday.

16             Madam Clerk, can you double check me on this and make

17   sure that I'm not --

18             THE COURTROOM DEPUTY:  You're open.

19             THE COURT:  -- double booking.

20             THE COURTROOM DEPUTY:  You're open.

21             THE COURT:  We had a matter, but I think it was

22   cancelled, so.  All right.

23             So, in any event, everyone's on the East Coast at this

24   point in time, Chicago being the, the farthest west so far?

25   I'm just wondering whether we start at 9:30 or whether 10:30 or

1   something else would be better.  Any thoughts?

2           MR. ERENS:  10:30 would be fine, your Honor.

3           THE COURT:  Okay.  Let's try 10:30 on the 6th.

4           Now the, if the parties that announce -- I, I realize

5   that with as many unnamed and unnoticed parties to the

6   adversary we have, it's hard to get a consensus, but if those

7   who are actually participatory feel like that that would be,

8   that exercise would be a waste of time and want to extend it a

9   further two weeks, we can try to do something.  The big problem

10  there is that would put us in the middle of the Kaiser

11  confirmation hearing and as Judge Beyer has a conflict with

12  this case, we're limited in, in what our options are there.

13          So it's up to you folks as to, to where we come with

14  that, but we're going to have problems getting the next

15  hearing, is what I'm telling you.  There's -- the only day I

16  see open right now is the 15th.  So maybe we could do something

17  else on the, on the 17th.  But again, that's a DBMP day.

18          But everything else for the rest of the month is

19  pretty much booked up and so if we're going to have to have a

20  lengthy evidentiary hearing, we're going to have some problems.

21  Don't want to encourage anyone to use that for a tactical

22  advantage, but, but the reality is, as I've said in the other

23  cases, this is a two-judge court.  It is very easy to overload

24  us and with four or five of these cases pending at the same

25  time, that's, that's quickly becoming what's happening.

1          So for now, let's just talk about it as being July the

2     6th, at 10:30.

3          Can I get the debtors to notice a, a continued

4     hearing?  Or maybe we treat it as a motion for extension, but I

5     want some sort of notice to go out at least to the primary

6     firms that are involved in this that we will have a further

7     hearing on the 6th.

8          MR. ERENS:  We'll do that, your Honor.

9          THE COURT:  Okay.

10         Anything else?

11       (No response)

12         THE COURT:  Well, it's a complex situation and I

13    appreciate how you've come to terms with it so quickly and for

14    the quality of the, the hearing today, given that we're on the

15    first day.  You've given me a lot to think about and we'll talk

16    about it further in detail.  But for now, I feel like that the

17    at least need to maintain the status quo, even though it's a

18    status quo of only six weeks duration, to get this thing slowed

19    down enough so that we can get a good presentation and, and a

20    decision that you can stand on.  'Cause I'm sure that this at

21    some point will go up on appeal and I want you to have a, the

22    Circuit or the District Court to have a good, clean look at it,

23    all right?

24         Anything else?

25         If not, we'll recess.

1           MR. CODY:  Your Honor, it's Mark Cody.

2           Just to follow up on some of the, the, the hearings,

3    the subsequent hearings for at least certain of the pleadings

4    we filed.

5           THE COURT:  Right.

6           MR. CODY:  Would it make sense for us to reach out to

7    your clerk's office, your clerks to try to pick an agreeable

8    date --

9           THE COURT:  Well, while we're all --

10          MR. CODY:  -- to send out a notice?

11          THE COURT:  While we're here, Mr. Cody, why don't we

12   talk for a moment about the needs --

13          MR. CODY:  Sure.

14          THE COURT:  -- of the case.  We got the TRO situation.

15   What kind of exigencies do you, do you anticipate?  How quickly

16   do you need to come back?

17          MR. CODY:  We have -- pardon me a second here.  Just

18   looking for the list of the things.  We have a number of

19   pleadings that we filed with our initial package that, that we

20   didn't hear today, given the, there was an, an emergency need

21   to have them heard, but those, those would be the, the initial

22   set of pleadings that we would, we would anticipate getting,

23   having heard by your, by your Honor --

24          THE COURT:  Uh-huh (indicating an affirmative

25   response).

1          MR. CODY:  -- which would be something, you know,

2    looking at the way you described your schedule, the July 15th

3    date might, might work.  It's not -- it shouldn't take a long

4    time to cover those off as a practical matter for, for at least

5    those pleadings and then, after that, I, I suspect we'll be

6    able to gauge what comes down.

7          THE COURT:  For that first day, do you anticipate more

8    than a half a day's worth of hearings?  I know you can't

9    anticipate --

10          MR. CODY:  No.

11          THE COURT:  - the, the objections, but --

12          MR. CODY:  I, I don't expect that, your Honor --

13          THE COURT:  Okay.

14          MR. CODY:  -- given the nature of what we're asking.

15          THE COURT:  For those who --

16          MR. CODY:  They appear to be --

17          THE COURT:  -- who are new to being with us, what

18    we've been trying to do, recognizing that Judge Beyer and I

19    can't keep the same people tied up in two different courts at

20    the same time, I have been working the DBMP hearings around

21    Kaiser days and that's what this would be.  That also, back

22    when we were all traveling to these hearings, the idea was to

23    save some travel time and cost and burden for all of your

24    folks.

25          The 15th works fine for me for that first one.

1          Does anyone else have problems?

2      (No response)

3          THE COURT:  Okay.

4          If you don't mind, let's set that on at 9:30, though,

5  so that since I have Kaiser the next day and we're in the, in

6  the rollup to the confirmation hearing, I suspect -- that's the

7  day of the Truck claim objection as well, I believe.

8          So let's start at 9:30 on the 15th.

9          MR. CODY:  Okay.

10          THE COURT:  Now -- all right.  And beyond that, are

11  you looking for something, a day in August?

12          MR. CODY:  Yeah.  If there's something your Honor has

13  that we could target, we would, we'd get something on the, on

14  the schedule and then we can evaluate it during --

15          THE COURT:  Okay.  This one, I think --

16          MR. CODY:  -- (indiscernible) bring it up if nothing

17  pops.

18          THE COURT:  Again, y'all will have to help me out,

19  those who are in Bestwall.  I have Kaiser on the 13th, DBMP on

20  the 14th.  Judge Beyer has the 20th with Bestwall.  I could

21  certainly give you the 21st, if you want that.  That's a

22  Friday.

23          THE COURTROOM DEPUTY:  Bestwall is for that day as

24  well.

25          MR. CODY:  That would work for the debtors, your

 1   Honor.

 2         THE COURT:  Bestwall's a two day?  Okay.

 3         Bestwall's got that one tied up, apparently.

 4         MR. CODY:  Okay.

 5         THE COURT:  So we don't want to -- we could go the

 6   other way.  The 12th is available and I believe the preceding

 7   week, we at one time were talking about having the DBMP

 8   preliminary injunction hearing the week of the 3rd through the

 9   7th and we have moved to September on that.  So that week is

10   free at the moment.

11         And as well, maybe the local attorneys can help me out

12   here.  With most of the RNC going to Jacksonville, the, the

13   24th through the 26th, we thought, was going to be unavailable.

14   I'm not sure if Downtown's still going to be locked down or

15   not.  We still have some business meetings that are being held

16   here and I'm not sure what the security plan is.

17         But potentially, the, if not those days, the 27th

18   would be available in August as well.  That's a Thursday.

19         MR. CODY:  Your Honor, August the 12th would,

20   considering we'd be in front of you on the 15th of July, maybe

21   August 12th would, would work --

22         THE COURT:  How about --

23         MR. CODY:  -- (indiscernible) your time.

24         THE COURT:  How about for the local attorneys?  That's

25   Judge Beyer's chapter 11 day and I'm not sure if that'll create

145

1    any havoc there but if y'all think we can work around that,

2    that, that'd be -- just make three days of it.

3              MR. CODY:  Your Honor, we'd be amenable to the end of

4    the month as well.  It's -- it's -- we're not trying to

5    create --

6              THE COURT:  Well, it's the same --

7              MR. CODY:  -- havoc.

8              THE COURT:  -- same problem.  The asbestos bar is

9    relatively small and so is my chapter 11 --

10             MR. CODY:  Okay.

11             THE COURT:  -- bar and I don't like having people that

12   need to be in two places at once.

13             Let's take August 27th, instead, and, and clear that

14   conflict, so.  All right?  And again, we'll make this one 9:30

15   Eastern time on that.

16             MR. CODY:  Okay.  Thank you.

17             THE COURT:  All right.  Is that enough to start you

18   off or do we need to go into September as well?

19             MR. CODY:  That should get us started, your Honor.

20   Thank you.

21             THE COURT:  Okay, very good.

22             Anything else we need to discuss today?

23        (No response)

24             THE COURT:  All right.  Thank you very much.

25             We will recess at this point.

1          MR. ERENS:  Thank you, your Honor.

2          THE COURT:  Uh-huh (indicating an affirmative

3   response).

4       (Proceedings concluded at 5:40 p.m.)

5

6

7

8

9                          CERTIFICATE

10          I, court approved transcriber, certify that the

11   foregoing is a correct transcript from the official electronic

12   sound recording of the proceedings in the above-entitled

13   matter.

14   /s/ *Janice Russell*                    June 25, 2020

15   Janice Russell, Transcriber                     Date

16

17

18

19

20

21

22

23

24

25